IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Case No. _____

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| RADNOR HOLDINGS | § | Case No. 06-10894-(PJW) |
| CORPORATION, *et al.*, | § | Jointly Administered |
| | | Adv. Pro. 06-50909 |
| | | |
| | § | |
| Debtors. | § | |
| _____ | § | |
| | § | |
| THE OFFICIAL COMMITTEE OF | § | |
| UNSECURED CREDITORS OF RADNOR | § | |
| HOLDINGS CORPORATION, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | |
| | § | |
| TENNENBAUM CAPITAL PARTNERS, LLC, | § | |
| *et al.*, | § | |
| | § | |
| Appellees. | § | |

**EMERGENCY MOTION FOR STAY PENDING APPEAL AND CORRESPONDING
EXTENSION OF THE BID, AUCTION AND SALE DEADLINES[1]**

The Official Committee of Unsecured Creditors (the "Committee") of Radnor Holdings

Corp. and certain of its affiliates (collectively, the "Debtors" or "Radnor"), by and through

undersigned counsel, on an emergency basis, move the Court to stay the Judgment In Favor of

Defendants On All Counts (the "Judgment") entered by the United States Bankruptcy Court for

the District of Delaware on November 16, 2006, and correspondingly to extend the bid, auction,

---

[1] Earlier today, the Committee filed a similar Motion for Stay in the Bankruptcy Court and requested an Emergency Hearing on such Motion. Given the exigencies of the circumstances and given that the Bankruptcy Court has yet to rule on the Motion, we are filing this Motion with the District Court.

and sale schedule (with the auction presently scheduled to be held on November 20, 2006 and the closing to be held following the sale hearing on November 21, 2006) to allow the Committee to exercise its right to appeal the Judgment on an expedited basis.

The Committee filed its notice of appeal of the Bankruptcy Court's Judgment and underlying Findings of Fact and Conclusions of Law and the Amended Findings of Fact and Conclusions of Law (collectively, the "Findings")[2] on an emergency basis and simultaneously moved for a stay in the Bankruptcy Court. Given the emergency nature of this stay request, the Committee is also filing this emergency motion to avoid any delay in the administration of this Court's appellate review in the event that the stay is denied by the bankruptcy court.

## SUMMARY OF ARGUMENT

A stay of the Judgment and corresponding short postponement of the bid and auction scheduled to commence on Monday, November 20, 2006 followed by the sale hearing and closing on Tuesday, November 21, 2006 is appropriate and necessary for the Committee to exercise its appellate rights.

Currently, an auction of the Debtors' assets is scheduled for today, November 20, 2006, with a sale hearing and closing scheduled for November 21, 2006. Based on the Bankruptcy Court's judgment, Tennenbaum's claim was allowed in the amount of $128 million and they have the right to credit bid the entire amount of such claim at the auction. Prior to the Bankruptcy Court's ruling, Four M submitted a competing bid for the Debtors' assets providing a significant recovery to the unsecured creditors. Four M's bid, however, was contingent on the Committee's ability to successfully recharacterize, subordinate or otherwise disallow Tennenbaum's Tranche

---

[2]     A copy of the Findings is attached hereto as **Exhibit A**.

C debt.  If the Committee is successful in its appeal of the Bankruptcy Court's judgment, Four M, or another interested bidder, may be able to outbid Tennenbaum at an auction or propose a plan that results in a recovery.  Absent a stay of the Judgment and continuance of the bid, auction and sale dates, the Committee's ability to generate a recovery for the unsecured creditors will be foreclosed.  The Committee has simultaneously filed a motion to expedite the appeal.  The Committee is not seeking a lengthy delay of the sale process.  Neither the Debtors nor Tennenbaum will be prejudiced by a short delay of the sale process.

The undisputed evidence at trial established that the Debtors have been operating profitably in recent months, and there is no reason to believe that the successful trend will not continue during the moderate extension period necessary for the Committee to prosecute its appeal on an expedited basis.  Thus, no party in interest will be prejudiced if a stay and extension of the sale are granted.  On the other hand, if such relief is denied and the sale goes forward under the current schedule, the Committee's appeal, no matter how meritorious, may be rendered moot under 11 U.S.C. §363(m), leaving the Committee and its constituents, the unsecured creditors, without any appellate remedy.

The accelerated course of these bankruptcy proceedings should weigh heavily on the Court in considering this stay request:  The petition was filed on August 21, 2006, the Committee was granted standing to pursue claims in an adversary proceeding on behalf of the Debtor's estate on October 30, 2006, the Committee filed its adversary complaint on October 31, 2006, the trial commenced (without an answer ever being filed) on November 2, 2006, and concluded after 8 full days of testimony on November 14, 2006, and the bankruptcy court entered its Judgment (considering more than a dozen witnesses, and more than 350 documents) on the same day that the parties submitted their proposed findings of fact and conclusions of law, and post-

trial memoranda.  Not surprisingly, in ruling short-order for Tennenbaum, the bankruptcy court adopted almost wholesale Tennenbaum's proposed findings of fact and conclusions of law.[3]

Given the accelerated schedule under which this case proceeded from complaint to Judgment, coupled with the fact that the exigencies in the form of a cash crisis originally thought to necessitate expedited proceedings are no longer operative, a moderate stay and corresponding extension of the auction and sale deadlines to allow review on appeal would be appropriate. Furthermore, the likelihood of the Committee's success on the merits of the appeal, and the virtual certainty that the Committee and its constituents, the unsecured creditors, will suffer irreparable harm absent a stay, support granting a stay of the effectiveness of the Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    RADNOR'S FINANCIAL CRISIS.

In August 2005, Radnor was overleveraged, insolvent and desperate for additional capital.  Declining profitability and rising debt from Radnor's aggressive expansion of manufacturing capacity had stripped the value of CEO Michael Kennedy's 80% equity stake, and Radnor needed $50 million of new capital to stay afloat pending a subsequent attempt at an elusive IPO that would delever the Company and reverse the negative value of Kennedy's equity.

---

[3] The use of proposed orders for ruling that go beyond housekeeping orders is uniformly discouraged, *Anderson v. City of Bessemer,* 470 U.S. 564 (1985), because does not give "assurance that the trial court gave careful attention to the evidence and the arguments presented and reached a decision only after personal analysis."  *In re Colony Square Co.,* 60 B.R. 1003, 1016-17 (N.D. Ga. 1986); *accord, e.g., In re Dixie Broad., Inc.,* 871 F.2d 1023, 1030 (11th Cir.), *cert. denied,* 493 U.S. 853 (1989); *In re Wisc. Steel Corp.,* 48 B.R. 753, 763 n.7 (N.D. Ill. 1985); *Fields v. City of Tarpon Springs,* 721 F.2d 318, 320-21 (11th Cir. 1983); *Kaspar Wire Works, Inc. v. Leco Eng'g & Machine, Inc.,* 575 F.2d 530, 543 (5th Cir. 1978); *Keystone Plastics, Inc. v. C & P Plastics, Inc.,* 506 F.2d 960, 962-63 (5th Cir. 1975).  Here, the bankruptcy court's virtual wholesale adoption of Tennenbaum's proposed findings of fact and conclusions of law, while understandable based on the accelerated course of proceedings necessitated by the auction and sale schedule, is not insignificant and should warrant at least an opportunity to revisit the ruling now that the exigent circumstances are shown no longer to exist.

Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, and Special Value Opportunities, LLC, (collectively "Tennenbaum") presented Radnor's only option in August 2005. Lehman Brothers, which had been engaged to assist Radnor in its effort to raise capital, was rejected by several other potential investors due to concerns about Radnor's debt level and unrealistic earnings expectations.[4] One of Tennenbaum's core investment strategies is to invest in distressed companies in order to acquire equity of the company in a restructuring transaction.[5]

On October 27, 2005, upon completing its due diligence, Radnor and Tennenbaum entered into a series of agreements for the purchase of preferred stock with an aggregate liquidation preference of $25 million, pursuant to which agreement Tennenbaum: (i) had the right to appoint a director and observer to the Debtors' board[6]; (ii) had the right to appoint 40% of the Debtors' Board in the event of an earnings miss[7]; and (iii) had the right of approval before the Debtors could file a registration statement, hire new officers, dispose of substantially all of its assets, or enter into a merger or consolidation[8]. In addition, as a precondition to closing, Tennenbaum required that Radnor enter into a written employment agreement with Kennedy, and played an active role in the negotiation of Kennedy's employment agreement.[9]

---

[4]     See Kennedy, 11/2/06 Tr. at 355-59, 11/6/06 Tr. at 487; Hastings, 11/7/06 Tr. at 878, 892-93; Hopkins 11/7 Tr. at 947-50, 960-66; Finigan, 11/8/06 Tr. at 1117, 1131-32; Palm, 11/8/06 Tr. at 1220-21; Exs. 18, 28, 32, 299, 300. Simultaneously with filing this motion, the Committee submitted copies of the unofficial transcripts referred to herein to the District Court on a CD.

[5]     See Feliciano, 11/2/06 Tr. at 189-90.

[6]     Hastings, 11/7/06 Tr. at 929; Exs. 78 at 18-19.

[7]     See Kennedy, 11/3/06 Tr. at 386; Hastings, 11/7/06 Tr. at 901, 927-28; Ex. 78, at 18-19; Ex. 79, at 1-2.

[8]     See Kennedy, 11/6/06 Tr. at 583-84; Ex. 78 at 20-21.

[9]     See Feliciano, 11/2/06 Tr. at 122-23; Kennedy, 11/3/06 Tr. at 372-73, 11/6/06 Tr. at 498-500; Ex. 77 at 26; Ex. 80, at 3; Ex. 168; Ex. 171, at TCPE947.

Thereafter, on December 1, 2005, Radnor and Tennenbaum closed on Tranche A loans and Tranche B loans, bringing $95 million into Radnor.[10]

During the months that followed, Tennenbaum had complete and unfettered access to Radnor's financial and operating information: (i) Tennenbaum received as much, if not more, of Radnor's financial and operating data on a day-to-day and week-to-week basis as Kennedy[11]; and (ii) Tennenbaum had at least bi-weekly calls with Radnor's financial staff[12]. With that information, on April 4, 2006, Radnor and Tennenbaum closed on Tranche C loans, bringing into Radnor an additional $23.5 million, $3.2 million of which went to pay the first interest payment on the Tranche A and Tranche B loans.[13] Tennenbaum received detachable warrants to purchase 7% of all classes of Radnor's outstanding stock in exchange for the funds that Tennenbaum advanced as part of Tranche C. Additionally, as a condition of the Tranche C loans, Tennenbaum had (i) the right to designate a majority of Radnor's board upon the acceleration of Tranche C[14], and (ii) a $10 million personal guaranty from Kennedy[15].

Prior to closing on Tranche C, as required by the bond indenture, Radnor solicited the unsecured bondholders for consent, which the bondholders gave but based only on publicly available information -- the bondholders did not have the benefit of the complete financial and

---

[10]    Feliciano, 11/2/06 Tr. at 119; Exs. 91-94.

[11]    See Feliciano, 11/2/06 Tr. at 119-20, 127-33, 212, and 11/3/06 Tr. at 249-53, 325-27; Kennedy, 11/3/06 Tr. at 410-13, 11/6/06 Tr. at 521-25; Hastings, 11/7/06 Tr. at 902-03; Mehrotra, 11/3/06 at 289-90, 297-301; Kelly, 11/7/06 Tr. at 838-39; Ex. 119, 122, 124, 125, 133, 136-137, 144-145, 151-152, 154-155, 188-189, 211, 226, 347.

[12]    See Feliciano, 11/2/06 Tr. at 127-33; Feliciano, 11/3/06 Tr. at 249-53; Mehrotra, 11/3/06, at 297-301; Kelly, 11/7/06 Tr. at 838-39; Ex. 211, 347.

[13]    See Feliciano, 11/2/06 Tr. at 154, 235; Kennedy, 11/3/06 Tr. at 441, 11/6/06 Tr. at 553-54; Kelly, 11/7 Tr. at 823, 829-30; Exs. 171-76, 178-79.

[14]    See Kennedy, 11/3/06 Tr. at 439-40; Ex. 173, at 1-2.

[15]    See Feliciano, 11/2/06 Tr. at 159; Kennedy, 11/3/06 Tr. at 434; Ex. 171.

operating data that had been provided to Tennenbaum.[16]  None of the other unsecured creditors were solicited for their consent.[17]

By May 2006, as Radnor's financial crisis escalated, Tennenbaum became involved in every facet of Radnor's restructuring efforts.[18]  More specifically: (i) Tennenbaum led the hiring of Radnor's new COO, Stanford Springel[19]; (ii) Tennenbaum's general counsel attended certain of Radnor's board meetings[20]; and (iii) Tennenbaum participated in hiring Radnor's bankruptcy counsel and restructuring advisor[21].

Steven Darr, the unrebutted restructuring and valuation expert who testified at trial, opined that Radnor was insolvent as of October 27, 2005, December 1, 2005, and April 4, 2006.[22]  Darr further opined that Radnor had insufficient capital to pay its ongoing operating expenses and interest on its debt, and that Radnor's financial ratios could be brought in line with industry standards only if the Tranche A loans and Tranche B loans were treated as equity and not debt.[23]  As a result of the foregoing transaction, $158.6 million in assets once available to satisfy unsecured creditors' claims as of October 27, 2005 were wiped out, leaving the unsecured creditors with nothing.[24]

---

[16]     See Feliciano, 11/2/06 Tr. at 235-38; Kennedy, 11/3/06 Tr. at 456-57, 11/6/06 Tr. at 536-37; Exs. 167, 186, 320.

[17]     See Kennedy, 11/6/06 Tr. at 596.

[18]     See Feliciano, 11/2/06 Tr. at 166-67; Mehrotra, 11/3/06 Tr. at 300-01.

[19]     See Feliciano, 11/2/06 Tr. at 166.

[20]     See Kennedy, 11/3/06 Tr. at 446-48; Ex. 214.

[21]     See Feliciano, 11/2/06 Tr. at 171-766; Ex. 228.

[22]     See Darr, 11/6/06 Tr. at 641-45, 11/7/06 Tr. at 781-82; Ex. 346 at 8-18 & Exs. I-O.

[23]     See Darr, 11/6/06 Tr. at 644-45; Exs. 356 at -19 & Exs. P & Q.

[24]     See Darr, 11/6/06 Tr. at 670-72; EX. 346 at 20 & Ex. R.

2.    **RADNOR'S DEMISE INTO BANKRUPTCY ON ACCELERATED COURSE OF PROCEEDINGS.**

On August 21, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue in the possession of their properties and management of their business as debtors-in-possession ("DIP"), pursuant to 11 U.S.C. §§1107 and 1108. No trustee or examiner has been appointed.

On August 31, 2006, the Office of the United States Trustee appointed the Committee, the members of which are U.S. Bank, N.A. (the indenture trustee for the bonds), The Airlie Group (a bondholder), Barclays Bank PLC (a bondholder), Peritus I Asset Management LLC (a bondholder), Total Deyro Chemicals USA, Inc. (a trade creditor), Lyondell Chemical Company (a trade creditor), and Polar Plastics, Inc. (a trade creditor and holder of an unsecured note for payment of purchase price).

On the Petition Date, the Debtors filed Debtors' Motion for (I) an Order (A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (D) Approving Bid Protections, and (E) Granting Certain Related Relief; and (II) an Order (A) Approving The Proposed Sale, (B) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (C) Granting Certain Related Relief (the "Sale Motion"). The Sale Motion sought two levels of relief: (i) approval of procedures for bidding on substantially all of the Debtors' assets (the "Bid Procedures"); and (ii) approval of the sale to Tennenbaum of substantially all of the Debtors' assets (the "Proposed Sale").

On September 11, 2006, the Committee filed its objection to the Bid Procedures on multiple grounds (the "Bid Procedures Objection"), specifically reserving the Committee's rights to object to the Proposed Sale. See Bid Procedures Objection, n.2. [Docket No. 144]

The Debtors and the Committee reached an agreement regarding certain modifications to the proposed Bid Procedures that resolved the Committee's Bid Procedures Objections. On September 22, 2006, the bankruptcy court entered the Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 2002 and 6004 (I) Establishing Bid Procedures Relating to the Sale of the Debtors' Assets, (II) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (IV) Approving the Break-Up Fee and Expense Reimbursement Provision, and (V) Granting Related Relief (the "Bid Procedures Order").

On October 13, 2006, the Debtors' filed a purchase price estimate (the "Purchase Price Estimate") for the Proposed Sale. The estimated total unadjusted purchase price is $224,680,000 (the "Current Purchase Price").

On October 18, 2006, the Committee filed its Objection to Proposed Credit Bid (the "Credit Bid Objection"), objecting to Tennenbaum's ability to credit bid its claims. In addition, the Credit Bid Objection incorporated by reference the arguments contained in the adversary proceeding complaint filed as an exhibit to that certain Motion for Order Granting the Committee Standing to Prosecute Actions on Behalf of the Debtors' Estates Against Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, Special Value Opportunities, LLC, and Jose E. Feliciano, and for Related Relief (the "Motion for Standing"), also filed on October 18, 2006.

On October 30, 2006, over the Debtors' objections, the bankruptcy court entered that certain Order Granting the Official Committee of Unsecured Creditors Standing to Prosecute Actions on behalf of the Debtors Estates Against Tennenbaum Capital Partners, LLC, Special Value Expansion Fund, LLC, Special Value Opportunities, LLC, and Jose E. Feliciano and Related Relief (the "Standing Order").  On October 31, 2006, pursuant to the Standing Order, the Committee commenced this adversary proceeding by filing a complaint against Tennenbaum, seeking to disallow its approximately $128 million proof of claim and thereby to avoid a credit bid by Tennenbaum at the imminent auction and sale.  On November 3, 2006,  the Debtors appealed the Standing Order to this Court, without obtaining a stay.

On November 2, 2006, in the absence of a stay pending the Debtors' appeal, the bankruptcy court commenced an 8-day trial on the adversary complaint against Tennenbaum.  At the outset of the trial, the bankruptcy court granted the Debtors' Emergency Motion to Join Adversary Proceeding or, in the Alternative, to Intervene as of Right.  At the conclusion of the Trial, the Committee submitted a Notice of Withdrawal of Certain Counts of the Complaint Pursuant to Fed.R.Bankr.P. 7015, and thereafter the parties submitted their respective proposed Findings of Fact and Conclusions of Law, as well as summaries of the legal standards and factual support for each of the remaining counts in the Complaint.  In addition, at the request of the bankruptcy court, the Committee submitted a Statement of Claims Supported by the Expert Testimony of Stephen B. Darr.

3.    **THE COMMITTEE'S ATTEMPT TO EXTEND THE AUCTION AND SALE DEADLINES.**

On November 15, 2006, the Committee filed its emergency motion to facilitate a higher and better bid through a limited extension of certain deadlines as set forth in the Bid Procedures

Order (the "Alternative Transaction Motion").  In connection with the Alternative Transaction Motion, the Committee submitted the term sheet for the proposed bid by Four M Investments, LLC ("Four M").[25]  In that motion, which only Tennenbaum opposed, the Committee requested the Court to extend the deadline for the submission of bids, the auction date and the sale hearing by approximately 12 days to allow the Committee and Four M to complete their negotiations, Four M to complete certain limited due diligence, and Four M's financing sources to complete their financial due diligence so that commitments may be issued.  Four M's bid was contingent on the disallowance, subordination or recharacterization of Tennenbaum's Tranche C debt. Four M's bid was valued at $250 million.

The bankruptcy court heard the Alternative Transaction Motion on November 16, 2006 at 4:00 p.m.  Before hearing the motion, the bankruptcy court announced from the bench the court's decision denying each of the Committee's claims for relief against Tennenbaum in the Tennenbaum Adversary Proceeding.  In light of the Court's decision, the bankruptcy court continued the hearing on the Alternative Transaction Motion to allow the parties time to assess the impact of the decision on the financing for the proposed Four M transaction.[26]

From the outset, the Committee has expressed concern about Tennenbaum's ability to credit bid and its potential impact on the market place.  The market place has now spoken.  No other bids have been submitted and Tennenbaum is poised to purchase the Debtors' assets without contest.

---

[25]    Four M subsequently filed a timely bid.

[26]    In light of the bankruptcy court's entry of the Judgment, Four M has elected not to pursue its bid.

On November 20, 2006, the Debtors commenced the auction at 9:00 a.m. E.T. Tennenbaum did not even attend the auction. Furthermore, the Debtors announced that they now valued Tennenbaum's bid at $186 million to $190 million. The Debtors adjourned the auction to 5:00 p.m. E.T. on November 20, 2006 because they did not yet have an agreement with Tennenbaum on the terms of an asset purchase agreement, the estates are allegedly administratively insolvent based on Tennenbaum's offer and the Committee had requested an extension of the auction and the sale hearing.

**4.    THE JUDGMENT.**

On November 16, 2006, the bankruptcy court entered its Findings and Judgment.

## THE STANDARD FOR GRANTING A STAY

Bankruptcy Rule 8005 contemplates that a bankruptcy court can protect the rights of the parties while an appeal of one of its orders is pending:

> [T]he bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

The Third Circuit has recognized that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In re Highway Truck Drivers & Helpers Local Union #107,* 888 F.2d 293, 298 (3d Cir. 1989). The granting of a motion for a stay pending appeal is commended to the bankruptcy court's sound discretion. *In re United Merchants & Mfrs., Inc.,* 138 B.R. 426, 430 (D. Del. 1992).

The standards that guide a court in the exercise of its discretion to grant stay relief are similar to the standards that govern the issuance of a preliminary injunction, and accordingly applies the following well-known four factors: (i) whether the moving party has a strong

likelihood of success on the merits of the appeal; (ii) whether the movant will be irreparably harmed absent a stay; (iii) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (iv) where the public interest lies. *Republic of the Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 658 (3d Cir. 1991). The analysis contemplates "individualized judgments in each case," *id.*, such that no single factor is outcome determinative. *In re Allegheny Health, Educ. & Research Found.,* 252 B.R. 309, 321 (W.D. Pa. 1999); *In re Roth American, Inc.,* 90 B.R. 94, 95 (Bankr. M.D. Pa. 1988).

The "likelihood of success" test must not be taken too literally; a court need not "confess error" to grant a stay. *Evans v. Buchanan,* 435 F. Supp. 832, 843 (D. Del. 1977). Indeed, on balance, the more likely it is that the movant will suffer irreparable harm absent a stay, the less strong the showing of success on appeal needs to be, and vice-versa. *E.g., Nordhoff Invs., Inc. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp.),* 250 B.R. 207, 215 (D. Del. 2000) ("*Zenith I*"), *aff'd,* 258 F.3d 180 (3d Cir. 2001) ("*Zenith II*"); *accord, e.g., Sofinet v. INS,* 188 F.3d 703, 707 (7th Cir. 1999).

In *Evans,* the court explained:

Although this standard is similar to one of the tests for issuance of a preliminary injunction, the posture of a case is significantly different when preliminary injunctive relief is sought from when a stay is requested. In the former, the Court has not ruled on the merits of the case and need only make an initial determination of the reasonable probability of the applicant's eventual success. In the latter, the Court has issued its determination, after a full consideration on the merits. The above-quoted standard would seem to require that a district court confess to having erred in its ruling before issuing a stay.

Common sense dictates that a literal reading of the standard would lead most probably to consistent denials of stay motions, despite the immediate threat of substantial irreparable injury to the movant. The almost inescapable conclusion is that the standard cannot mean what its language would indicate....

In a case where the movant will suffer irreparable injury in the absence of a stay, consideration of the merits of the movant's appeal permits an evaluation of

> whether that injury is likely to occur in any event.  It seems illogical, however, to
> require that the court in effect conclude that its original decision in the matter was
> wrong before a stay can be issued.

*Id.* at 843-44; *accord, e.g., Rothenberg v. Ralph D. Kaiser Co., Inc.,* 200 B.R. 461 (D.D.C. 1996) (probable irreparable harm is principal prerequisite to issuance of discretionary stay pending appeal); *In re City of Bridgeport,* 132 B.R. 81 (Bankr. D. Conn. 1991) (likelihood of injury is primary consideration, such that injury is imminent, and not remote or speculative).

Moreover, there is strong support for the proposition that courts should give serious consideration to motions seeking a preservation of the status quo pending appeal in the bankruptcy context.  *In re Gucci (Paolo v. Sinatra),* 105 F.3d 837 (2d Cir. 1997).  In *Gucci,* upon the district court's denial of a stay, the parties sought a stay in the Second Circuit, but prior to the Second Circuit's ruling on the stay the sale authorized by the underlying order was consummated and a motion to dismiss as moot followed.  *Id.* at 838-39.  The Second Circuit, noting the limited scope of review under §363(m) after the sale had been consummated, expressed concern that the district court's denial of the stay request effectively denied meaningful review on appeal and cautioned:

> On this motion to dismiss an appeal involving a bankruptcy sale, we write to alert
> district judges to a major and perhaps unappreciated significance of their action,
> after denying a stay pending appeal, in denying even a one-day stay to permit a
> party to seek a stay pending appeal from the Court of Appeals.

105 F.3d at 838.  The Second Circuit thus admonished that where, as here, significant and substantially irreversible actions may occur immediately upon the issuance of an order, the lower court has an affirmative responsibility to preserve issues for the consideration of the appellate court:

> [W]here an appellant timely moves to stay a judicially authorized sale, a district
> court's denial of that motion will similarly limit the issues on appeal.  Although

an appellant's challenge to a sale authorization might raise meritorious arguments, a district court's denial of a requested stay has the effect of precluding this Court from reviewing those issues, other than the good faith of the purchaser, if the sale has closed in the interim. *It becomes important for district judges to appreciate the special consequences of denying a stay of a bankruptcy sale, even a very brief stay to permit this Court time to consider whether a stay pending appeal is warranted*.

*Id.* at 840 (emphasis added).

In addition, Bankruptcy Rule 8005 enables this Court to "tailor relief to the unique circumstances of the case, '[n]otwithstanding Rule 7062,' by making any 'appropriate order during the pendency of an appeal on such terms as will protect the rights of all the parties in interest.'" *In re Trans World Airlines, Inc.,* 18 F.3d 208, 212 (3d Cir. 1994); *Quarles v. Miller,* 193 B.R. 779, 782 (W.D. Va. 1996). Thus, Rule 8005, by its express terms provides this Court with broad discretion. *Trans World Airlines,* 18 F.3d at 211 n.6; *Quarles,* 193 B.R. at 782. Indeed, Bankruptcy Rule 8005 is "a flexible tool which permits a bankruptcy court to uniquely tailor relief to the circumstances of the case, so that the appellate process will neither undo nor overwhelm the administration of the bankruptcy case." *In re Gleasman,* 111 B.R. 595, 599 (Bankr. W.D. Tex. 1990) (holding that a bankruptcy judge "can design stays to avoid unjust results, taking into consideration all the exigencies of the entire bankruptcy case.").

## ARGUMENT

### 1. THE COMMITTEE IS LIKELY TO SUCCEED ON THE MERITS.

The Judgment rests on several legal errors that provide strong grounds for appeal.

### a. The Bondholders' Acquiescence.

The bankruptcy court ruled that, "the Committee's claims are barred by the equitable defense of acquiescence, as applied by the Delaware courts." Findings 40 at ¶41. And the Court explained the basis for its ruling as follows: "95% of the noteholders, including a majority of the

members of the Committee, … voted in favor of Tranche C and accepted $675,000 in exchange for their consent.  Thus, they have acquiesced to the Tranche C Loans.  Having acquiesced to it, they cannot now be heard to argue that Tranche C should be treated as equity, nor that entering into Tranche C was a breach of fiduciary duty."  *Id.* at ¶42.  In other words, the Court has found that the entire Committee is barred from bringing its claims because certain bondholders who are also members of the Committee, but do not make up the entire committee, allegedly acquiesced. *Id.* at ¶¶42-43.  The Court's ruling is not likely to be sustained on appeal.

For one thing, certain of the claims asserted by the Committee are derivative claims belonging to the Debtors, which claims the bankruptcy court granted the Committee standing to prosecute on behalf of the Debtors' estates.  And even as to those claims that the bankruptcy court has determined to be direct claims, the Committee has asserted those claims on behalf of the entire creditor body, not just bondholders.  Moreover, that the bondholders on the Committee allegedly acquiesced cannot be applied to the entire Committee as a binding waiver.  As a matter of fact, the bondholders do not even constitute a majority of the Committee (they are 3 of 7 members), and more importantly the Committee represents the entire body of unsecured creditors and accordingly must act as fiduciaries for all creditors.  The Court's ruling does not find any decisional authority in bankruptcy.  *Id.*  And, the far-reaching policy implications of a decision that seems to rest on the Court's view based on an assumption and personal experience[27] is readily apparent and warrant review by this Court on appeal.

---

[27]    See Findings at 16 & ¶42 ("The consent of the noteholders is, in my view, clear evidence of the acknowledgment that the Company had serious liquidity problem and that the Tranche C secured debt transaction had the prospects of a solution to that problem.").

### b.    Tennenbaum's Insider Status.

An "insider" of a corporate debtor is defined in 11 U.S.C. §101(31)(B), as:  (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person, *e.g.,* individual, partnership or corporation, 11 U.S.C. § 101(41), controlling the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; (vi) a relative of a general partner, director, officer or person in control of the debtor.  Courts have consistently held that the "inclusive" definition of an "insider" in §101(31)(B) is "not limited to the examples given."  *Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.),* 2003 WL 21356090, *9 (Bankr. D. Del. May 29, 2003); *see also, e.g., In re Missionary Baptist Found. of Am., Inc.,* 712 F.206 (5th Cir. 1983) (recognizing that definition reflects expansive view of the scope of the insider class such that the definition is not limiting and must be flexibly applied); *Dressel Assocs. v. Beaver Valley Builder's Supply, Inc.,* 177 B.R. 507, 513 (Bankr. W.D. Pa. 1995) (recognizing that the "six … categories of corporate insider … are not exhaustive, and that the "definition … is flexible and not amendable to precise formulation").  *See also The News Journal Co. v. Little Caesars of Del., Inc.,* 2000 WL 33653432, *2 (Del. Com. Pl. Oct. 20, 200) (similarly interpreting Delaware's nearly identical statutory definition as "expansive rather than exhaustive").

More specifically, and pertinent to the Committee's appeal of the Judgment, when a corporation designates one of its officers, directors, or employees to serve on the board of another entity, it is the corporation and not the individual acting as the corporation's representative that is considered an insider. *E.g., Committee of Creditors Holding Unsecured Claims v. Citicorp Venture Capital, Ltd. (In re Papercraft Corp.),* 165 B.R. 980, 984-87 (Bankr. W.D. Pa. 1994), *withdrawn on other grounds,* 187 B.R. 486, 494-96 (Bankr. W.D. Pa. 1995),

*reversed and remanded on other grounds,* 211 B.R. 507, 513 (Bankr. W.D. Pa. 1995); *Dressel,* 177 B.R. at 513.

And, with respect to whether the control exerted is sufficient to bestow insider status, "[a]ny person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny may qualify as an 'insider.'" *In re Student Finance Corp.*, 335 B.R. 539, 547 (D. Del. 2005) (*citing In re Karen Louise Demko,* 264 B.R. 404, 408 (Bankr. W.D. Pa. 2001)); *accord, e.g, Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.),* 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) (quoting S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978)); *accord, e.g., Shubert,* 2005 W.L. 4705075 at *34; *Walsh v. Dutil (In re Demko),* 264 B.R. 404, 408 (Bankr. W.D. Pa. 2001). And as applied to an entity, the court must examine whether the suspect creditor (i) had more ability to assert control than other creditors, (ii) made management decision for the debtor, (iii) directed work performance, and (iv) directed payment of the debtor's expenses, ultimately to determine whether the day-to-day control over operations and policy reflects such influence as to be deemed an insider. *ABC Elec. Serv. Inc. v. Rondout Elec. Inc. (In re ABC Elec. Serv. Inc.),* 190 B.R. 672 (Bankr. M.D. Fla. 1975); *accord, e.g., Shubert,* 2005 W.L. 4705075 at *34; *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston,* 299 B.R. 732, 743 (Bankr. D. Del. 2003); *Official Unsecured Creditors Comm. v. Citicorp N. Am., Inc.,* 132 B.R. 869, 894 (Bankr. N.D. Ill. 1991).

The significance to the bankruptcy court's Judgment, of course, is that an insider's conduct that gives rise to a claim is subject to more rigorous scrutiny in determining whether the claim should be subordinated such that the burden is shifted. *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),* 926 F.2d 1458, 1465 (5th Cir. 1991); *accord, e.g., In re Mid-Am. Waste Sys., Inc.,* 284 B.R. 53, 69 (Bank. D. Del. 2002).

Here, the Court found that "Kennedy, not Tennenbaum, was in control of the Debtors," Findings 20 at ¶57, because Tennenbaum did not exercise day-to-day control over Radnor's business affairs or dictate Radnor's business policy and operations.   And therefore, the Court found, Tennenbaum could not be deemed "an insider for purposes of equitable subordination." *Id.* at 27, ¶11.  The bankruptcy court misapplied the standard.

Tennenbaum: (i) was a preferred stockholder[28]; (ii) had the right to appoint a director and observer to the Debtors' board and actually did[29]; (iii) had the right to appoint 40% of the debtor's Board in the event of an earnings miss[30]; (iv) was an active participant in the negotiation of Kennedy's employment agreement[31]; (v) had the right of approval before the Debtor could file a registration statement, hire new officers, dispose of substantially all of its assets, or enter into a merger or consolidation[32]; (vi) received as much, if not more, of the Debtors' financial and operating data on a day-to-day and week-to-week basis as Kennedy[33]; (vii) had at least bi-weekly calls with the Debtors' financial staff[34]; (viii) had the right to designate a majority of the Debtors' board upon the acceleration of Tranche C[35], and (ix) had a $10 million personal guaranty from Kennedy, the Debtors' majority shareholder[36].   The bankruptcy court's Judgment

---

[28]    See Exs. 77-79.

[29]    Hastings, 11/7/06 Tr. at 929; Exs. 78 at 18-19.

[30]    See Kennedy, 11/3/06 Tr. at 386; Hastings, 11/7/06 Tr. at 901, 927-28; Ex. 78 at 18-19; Ex. 79 at 1-2.

[31]    See Feliciano, 11/2/06 Tr. at 122-23; Kennedy, 11/3/06 Tr. at 372-73, 11/6/06 Tr. at 498-500; Ex. 77, at 26; Ex. 80, at 3; Ex. 168; Ex. 171, at TCPE947.

[32]    See Kennedy, 11/6/06 Tr. at 583-84; Ex. 78 at 20-21.

[33]    See Feliciano, 11/2/06 Tr. at 119-20, 127-33, 212, and 11/3/06 Tr. at 249-53, 325-27; Kennedy, 11/3/06 Tr. at 410-13, 11/6/06 Tr. at 521-25; Hastings, 11/7/06 Tr. at 902-03; Mehrotra, 11/3/06 at 289-90, 297-301; Kelly, 11/7/06 Tr. at 838-39; Ex. 119, 122, 124, 125, 133, 136-137, 144-145, 151-152, 154-155, 188-189, 211, 226, 347.

[34]    See Feliciano, 11/2/06 Tr. at 127-33; Feliciano, 11/3/06 Tr. at 249-53; Mehrotra, 11/3/06 at 297-301; Kelly, 11/7/06 Tr. at 838-39; Ex. 211, 347.

[35]    See Kennedy, 11/3/06 Tr. at 439-40; Ex. 173 at 1-2.

[36]    See Feliciano, 11/2/06 Tr. at 159; Kennedy, 11/3/06 Tr. at 434; Ex. 171.

is irreconcilable with these undisputed facts. Tennenbaum engaged in inequitable conduct by taking advantage of Radnor's undercapitalization for its own benefit, using its position to divert to itself the pool of assets previously available to satisfy unsecured creditors' claims. *See, e.g., In re Logue Mech. Contracting Corp.*, 106 B.R. 436, 438 (Bankr. W.D. Pa. 1989) ("When a corporation is undercapitalized, a shareholder must not be permitted to call his capital contribution a loan in order to reduce the risk of loss.").

The case law, as set out above, is clear that the burden of proof for equitable subordination claims turns on the threshold determination of insider status. If the bankruptcy court erred in finding that Tennenbaum was not an insider at the time of the Tranche C transaction, then the court also applied the wrong burden of proof for this claim. *Hovis v. Powers Constr. Co., Inc. (In re Hoffman Assocs., Inc.)*, 194 B.R. 943, 966 (Bank. D.S.C. 1995) (holding that subordination in light of inequitable conduct "is consistent with the basic goal of equality of distribution in bankruptcy").

Tennenbaum intervened with a financial strategy when Radnor was in a financial crisis and engaged in a high-stakes, dubious growth strategy with little hope of success -- based on Darr's undisputed expert testimony -- and as was surely apparent to Tennenbaum in the exercise of its due diligence. Tennenbaum agreed nonetheless to provide financing with full knowledge that the strategy was likely to fail, as shown by Tennenbaum's contemporaneous documentation at the time of the transaction. By the close of Tranche A and Tranche B, Tennenbaum was in place as Radnor's largest secured creditor on a loan that Tennenbaum surely knew was likely to go into default, reducing the pool of assets available to satisfy unsecured creditors' claims by at least the $25 million in new "secured debt" advances by Tranche A and Tranche B. *See In re Mid-American*, 284 B.R. at 71 (holding that injury caused by "inequitable conduct in reasonable

proximity to bankruptcy or while the corporation is in financial distress decreases the likelihood of the recovery of claims by general creditors, and thus injures them").[37]  Here, the injury is directly quantifiable, as Darr has shown that the pool of assets available to satisfy the claims of unsecured creditors shrank from $158.6 million to none.[38]  Tranche C, as an extension of the same inequitable conduct falls even harder under the same analysis.  By the time of that transaction, April 4, 2006, Tennenbaum was entrenched in Radnor's operations and finances, and Tennenbaum obtained a $10 million personal guaranty from Kennedy, giving Tennenbaum influence over the majority shareholder.[39]  Tennenbaum was clearly an insider under those circumstances.  *E.g., In re Papercraft*, 187 B.R. at 495.  And after Tranche C, Tennenbaum increased its penetration in Radnor's financial and operational affairs, obtaining access for its general counsel to Radnor board meetings, influencing the selection of bankruptcy counsel and restructuring advisors.

### c.    The Exclusion of Professor Rocks' Expert Report and Testimony.

The Bankruptcy Court granted Tennenbaum's motion *in limine* to strike the expert report and to preclude the related testimony of Professor Edward Rock.  Professor Rock, the Saul A. Fox Distinguished Professor of Business Law at the University of Pennsylvania Law School, is a corporate governance expert and his qualifications to testify as an expert in his field was never challenged.  The Committee intended to call Professor Rock to testify regarding the accepted

---

[37]    The bankruptcy court cited its personal "experience," not on any legal authority, for accepting Feliciano's self-interested testimony that the influences set out in the documents were "fairly typical" and "reasonable and appropriate" protections under the circumstances.  Findings at 6-7 & ¶13.

[38]    See Darr, 11/6/06 Tr. at 670-72; Ex. 346 at 20 & Ex. R.

[39]    See Feliciano, 11/2/06 Tr. at 127-33, 159, 212, 11/3/06 Tr. at 249-53; Mehrotra, 11/3/06 Tr. at 289-90, 297-301, 325-27; Kelly, 11/7/06 Tr. at 838-39; Kennedy, 11/3/06 Tr. at 410-13, 434, 439-40, 11/6/06 Tr. 521-25; Hastings, 11/7 Tr. at 902-03; Ex. 122, 124, 125, 133, 136-37, 144-45, 151-52, 154-55, 168, 171 at TCPE947, 173 at 1-2, 188-89, 211, 226, 347.

corporate governance standards and practices, thereby to assist the trier of fact -- here, the bankruptcy court -- in deciding whether Tennenbaum actions comport. Tennenbaum, conceding Professor Rock's qualifications as an expert, succeeded in striking the report and testimony on grounds that the testimony would: (i) opine on ultimate conclusions of law and fact; and (ii) comprise a collateral attack on the approved bidding procedures. The bankruptcy court's exclusion of Professor Rock's expert report and testimony is a likely basis for reversal on appeal.

Expert testimony is admissible, under Rule 702 of the Federal Rules of Evidence, in any area of "scientific, technical or other specialized knowledge," if such expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." While it is not permissible for an expert witness to testify as to the governing law, since that is the court's purview, *Berckeley Inv., Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 206), expert witnesses are routinely permitted to testify concerning business customs and practices. *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991); *First Nat'l State Bank of N. J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981).

More specifically, in *Wattel v. Browne*, 2006 WL 121186, *1 (D. Ariz. May 3, 2006), the court allowed expert testimony on corporate governance standards because "the standards of care that make up those duties and what conduct constitutes a breach of those duties are factual questions and proper subjects for expert testimony." Likewise, in *Pereira v. Coogan*, 281 B.R. 194, 199-200 (S.D.N.Y. 2002), the court determined that testimony by a corporate governance expert does *not* usurp the court's role, where the testimony is based on industry standards as established by previous judicial opinions. Indeed, it is recognized that discussion and examples of what "good corporate practices require according to industry custom and practice" can be

"useful to the trier of fact," and experience in the are of corporate governance "provides a reliable foundation" for opinions on "good corporate practices." *Id.*[40]

Here, Professor Rock would have assisted the bankruptcy court with basic standards and practices testimony, of the type routinely admitted to assist triers of fact in deciding issues that require an analysis of complex or specialized fields. Corporate governance is unquestionably a specialized area with its own standards and practices that have developed over decades, and Professor Rock's corporate governance testimony did not fall within the realm of impermissible legal opinion, but rather would have assisted the Court in understanding the parameters of the underlying transaction.

Moreover, the limitations on expert testimony in the context of legal opinions have been uniformly expressed as necessary to preserve the trial court's exclusive province to instruct the jury on the law. *E.g., Berckeley*, 455 F.3d at 217; *Leo*, 941 F.2d at 196; *see also, e.g., Cambra v. The Restaurant School*, 2005 WL 2886220, at *4 (E.D. Pa. Nov. 2, 2005) (recognized the distinction between bench and jury trials in terms of the admissibility of documentary evidence during trial). Such concerns are inapposite here, as the trial proceeded without a jury and the Court would have been well-equipped to weigh the testimony with discretion.

Professor Rock's testimony was intended to provide appropriate context with which to evaluate Tennenbaum's actions in light of accepted standards and practices of corporate governance, and the Court sitting as trier of fact would have been well-positioned to evaluate the

---

[40]    *See also, e.g., Consolidated Edison Co. of N.Y., Inc. v. UGI Util., Inc.*, 310 F. Supp. 2d 592, 600 (S.D.N.Y. 2004) (admitting testimony of corporate governance expert Jonathan Macey regarding company's control of subsidiary); *Cary Oil Co. v. MG Refining & Mktg., Inc.*, 2003 WL 1878246 (S.D.N.Y. April 11, 2003) (admitting law professor's testimony on corporate governance relating to the principles of veil piercing, because it "does not cross the boundaries into an opinion that would tell the jury what decision to reach"); *U.S. v. Pelullo*, 1993 WL 216127, *6 (E.D. Pa. June 18, 1993) (admitting testimony of Professor Coffee regarding proper corporate practice and procedures with respect to the responsibilities of a CEO).

weight of Professor Rock's opinions, and to discern any excess.  Professor Rock would simply have done what all expert witnesses must do:  Professor Rock would have rendered opinions, based upon review of the discovery and trial record, that would clearly have been helpful to provide insight beyond average understanding and experience, and measure by that guiding standard.  Professor Rock's testimony -- respectful of the Court's role as trier of fact and arbiter of law in this case -- was improperly excluded and provides a likely basis for reversal on appeal.

> **d.**    **The Deepening Insolvency Analysis.**

The Court rejected the Committee's breach of fiduciary duty claims as an attempt to try this case as a purported "deepening insolvency" case, and ruled that the Committee's claim cannot survive by any designation because "a board is not required to wind down operations simply because a company is insolvent, but rather may conclude to take on additional debt in the hopes of turning operations around."  Findings 29 at ¶16.  And the bankruptcy court accordingly found no fault in Tennenbaum's transactions, citing *Seitz v. Detweiler, Hershey & Assoc. (In re CitX Corp.)*, 448 F.3d 672, 677 (3d Cir. 2006), for the proposition that stock investments like Tennenbaum's $25 million preferred stock investment lessen insolvency rather than increase it and that a loan similarly does not increase insolvency but rather liabilities and assets in the same amount.  The bankruptcy court thereon determined that "much of the Committee's case at trial at best would have implicated the duty of care, not the duty of loyalty."  Findings 30 at ¶20.  The bankruptcy court's application of the lesser duty of care standard is not likely to be upheld on appeal.

When Feliciano, as Tennenbaum's designee, joined Radnor's board, the company was at least operating in the vicinity of insolvency, and its condition did not improve throughout Feliciano's tenure.[41]   Feliciano's fiduciary duty of loyalty therefore extended beyond the company's shareholders to Radnor's unsecured creditors. *See In re High Strength Steel, Inc.*, 269 B.R. 560, 569 (Bankr. D. Del. 2001) (director of insolvent corporation owes a fiduciary duty to the unsecured creditors); *Credit Lyonnais Bank Nederland v. Pathe Commc'ns Corp.*, 1991 WL 277613, * 34 (Del. Ch. Dec. 30, 1991) (directors owe fiduciary duties to creditors when the corporation is "operating in the vicinity of insolvency").

The fiduciary duty to creditors requires that the directors of an insolvent company "maximize the value of the assets for payment of unsecured creditors." *In re High Strength*, 269 B.R. at 569.  *See also Odyssey Partners, L.P. v. Fleming Co.*, 735 A.2d 386, 417 (Del. Ch. 1999).  Feliciano breached his duty of loyalty to Radnor and to the unsecured creditors when he used the information he obtained as a director to negotiate the Tranche C loans for the benefit of Tennenbaum, which further depleted the assets available to satisfy the unsecured creditors' claims.

## 2.   THE COMMITTEE WILL SUFFER IRREPARABLE HARM ABSENT A STAY.

Without a stay of the bankruptcy court's Judgment, the Committee will be irreparably harmed as its effort to appeal will be rendered moot.  As noted above, the Debtors commenced the auction on Monday, November 20, 2006 and presumably the sale will be consummated at the sale hearing and closing on Tuesday, November 21, 2006.  In that event, the Committee's appeal

---

[41]     See Darr, 11/6/06 Tr. at 641-45, 11/7/06 at 781-82; Ex. 346 at 8-18 & Exs. I-O.

to this Court may become moot under 11 U.S.C. §363(m).  *See Zenith II,* 258 F.3d at 185-86; *Continental Airlines,* 91 F.3d at 561.  Thus, in the absence of a stay pending appeal, the Committee may be denied the ability to exercise meaningfully its due process appeal rights.

**3.    A STAY PENDING APPEAL WILL NOT VISIT SUBSTANTIAL HARM UPON RADNOR OR TENNENBAUM.**

The relatively short time needed to accommodate the Committee's appeal to this Court will not visit any harm on Radnor, or any party in interest.  The Committee is committed to pursuing the appeal on an expedited basis, if permitted to do so.  The Debtors' counsel advised the Court at the hearing on the Committee's Alternative Transaction Motion that he could not represent that Radnor was in any immediate danger of running out of funds in the event of a short postponement, and the Debtors' periodic filings show that the Debtors have been running profitably ahead of budget since the commencement of these proceedings.

**4.    A STAY PENDING APPEAL WILL SERVE THE PUBLIC INTEREST.**

To the extent that the public interest is implicated by this matter at all, a stay pending the appeal will serve that interest.  The primary public policy underlying the bankruptcy laws is the just and fair administration and distribution of the assets of the estates.  As previously stated, Radnor is generating sufficient revenues to sustain its operations.  Unnecessarily rushing the bid, auction and sale procedure, the effect of which will deprive the Committee of its right to appeal the Judgment allowing a $128 million claim by Tennenbaum, and virtually guaranty its success with credit bid, cannot be squared with the public's interest.  It would also preclude the Committee from pursuing the bid with Four M in the event the Judgment is overturned - a bid that results in a recovery for the unsecured creditors.

In addition, where, as here, there is a possibility of an appeal becoming moot without a stay, a stay pending appeal will serve the public interest by preserving the right to an effective appellate process. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 105 F.3d 837, 840 (2d Cir. 1997). Indeed, the public-interest requirement for granting a stay to avoid the deprivation of due process is overwhelming.

## NO BOND IS NECESSARY

The Court has discretion to grant a stay pending appeal under Rule 8005 without requiring the posting of a supersedeas bond, *Zenith II,* 258 F.3d at 191; *Schwartz v. Covington,* 341 F.2d 537 (9th Cir. 1965); *In re Byrd,* 172 B.R. 970, 974 (Bankr. W.D. Wash. 1994), and the exercise of such discretion is warranted here. The purpose of such a bond "is to protect the adverse party from potential losses resulting from the stay." *In re United Merchants & Mfrs., Inc.,* 138 B.R. 426, 430 (D. Del. 1992). But where the adverse party will not suffer any losses as a result of a stay pending appeal, a bond is not necessary. *Zenith II,* 258 F.3d at 191; *United Merchants,* 138 B.R. at 430.

Here, the entry of a modest stay so that the Committee can pursue an expedited appeal will not harm in any way the Debtors' business, nor prejudice Tennenbaum. Indeed, the undisputed evidence at trial established that the Debtors are showing a positive economic trend with sufficient cash flow generated in recent months to sustain its operations, and there is no reason to expect any quantifiable harm will occur during a prompt and expedited appeal process. There is accordingly no likely loss to the Debtors or any party in interest if the bid, auction and sale schedule is delayed by a modest extension pending the Committee's appeal of the bankruptcy court's Judgment to warrant a supersedeas bond.

## CONCLUSION

The Debtors' financial picture has greatly improved and is trending upward, and the undisputed evidence presented at trial confirmed that the Debtors will easily survive a short extension of the current bid, auction and sale schedule to allow the Committee to pursue an expedited appeal of the Judgment. As argued by the Committee in the Emergency Motion of the Official Committee of Unsecured Creditors to Facilitate a Higher and Better Bid Through a Limited Extension of the Bid, Auction, and Sale Deadlines as contained in the Bid Procedures Order [Docket No. 277], filed on November 16, 2006, the undisputed testimony at trial by the Debtors' Chief Restructuring Officer, Stan Springel, demonstrated unequivocally and without dispute was that the Debtors' financial picture has demonstrated a marked improvement and is trending upward, and accordingly would tolerate a modest extension to the current schedule. No prejudice will weigh on the Debtors or Tennenbaum as a result of a modest extension. On the other hand, the benefit to the Committee's right to appeal is absolute.

A brief extension would allow the Committee the opportunity to exercise its right to appeal to this Court, to raise the legal issues that warrant consideration, the importance of which cannot be overstated in this accelerated proceeding. Indeed, the bankruptcy court itself recognized the unusual schedule of these proceedings: "I don't think I have ever had a trial of this magnitude where I did not have a post trial briefing and a number of months to make a decision." (Tr. 806). Yet, here, the bankruptcy court heard nearly two weeks of testimony, and only one day later announced its ruling and almost wholesale adopted Tennenbaum's proposed order submitted a day earlier.

Based on the foregoing, the Committee respectfully requests the Court to stay the bankruptcy court's Judgment and to postpone the imminent auction and sale so that the

Committee will have an opportunity expeditiously to appeal to this Court, and to grant such other

and further relief as the Court shall deem equitable and proper.

Dated: Wilmington, Delaware
      November 20, 2006

                                          **GREENBERG TRAURIG, LLP**

                                          /s/ Victoria W. Counihan
                                          Donald J. Detweiler (I.D. No 3087)
                                          Victoria W. Counihan (I.D. No 3488)
                                          The Nemours Building
                                          1007 North Orange Street, Suite 1200
                                          Wilmington, Delaware 19801
                                          Telephone: 302-661-7667
                                          Fax: 302-661-7360

                                          - and -

                                          Francis A. Citera
                                          Nancy A. Peterman
                                          Nancy A. Mitchell
                                          77 West Wacker Drive, Suite 2500
                                          Chicago, IL 60601
                                          Telephone: 312-456-8400
                                          Fax: 312-456-8435

                                          COUNSEL TO THE OFFICIAL COMMITTEE
                                          OF UNSECURED CREDITORS

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RADNOR HOLDINGS | ) | Case No. 06-10894 PJW |
| CORPORATION, *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| RADNOR HOLDINGS | ) | |
| CORPORATION, *et al.*, | ) | Adversary Proceeding No. 06-50909 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TENNENBAUM CAPITAL | ) | |
| PARTNERS, LLC; SPECIAL | ) | |
| VALUE EXPANSION FUND, LLC; | ) | |
| SPECIAL VALUE OPPORTUNITIES | ) | |
| FUND, LLC; AND JOSÉ E. | ) | |
| FELICIANO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ———————————————— | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 21, 2006 (the "Petition Date"), Radnor Holding Corp. and its affiliated

chapter 11 debtors ("Debtors" or "Radnor") commenced the above-captioned chapter 11

cases. On September 22, 2006, the Court entered its "Final Order (I) Authorizing

Debtors (A) to Obtain Postpetition Financing . . ." (the "DIP Financing Order"). Also on

Sept. 22, 2006, the Court entered its "Order . . . (I) Establishing Bid Procedures Relating

to Sale of Debtors' Assets . . ." (the "Bid Procedures Order"). On October 30, 2006, the

Court entered its "Order Granting Official Committee . . . Standing" (the "Standing Order").

Pursuant to the DIP Financing Order and the Standing Order, the Court authorized the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee") to file a Complaint against Tennenbaum Capital Partners, LLC, Special Value Opportunities Fund, LLC, Special Value Expansion Fund, LLC (collectively, "Tennenbaum" or "TCP"), and José E. Feliciano (collectively with TCP, "Defendants"). Pursuant to the Bid Procedures Order (at ¶ 8), the Court ordered that the trial on the merits of the Complaint would include a determination on the allowance of the $128.8 million proof of claim filed by the Defendants. Also pursuant to the Bid Procedures Order (at ¶ 9), the Court ordered that the Defendants would be authorized to credit bid any allowed claim that survived adjudication of the Complaint.

On October 31, 20006, Plaintiffs filed the Complaint. By the time that trial commenced, the parties had engaged in nearly two months of extensive pre-trial discovery. The Court conducted eight full days of trial between November 2 and November 14, 2006, heard testimony from fourteen witnesses and admitted more than 350 documents into evidence. Based upon evidence presented at trial, the Court hereby makes the following Findings of Facts and Conclusions of Law. Based upon these Findings of Fact and Conclusions of Law, and in accordance with the requirements of Federal Rule of Bankruptcy Procedure 9021, the Court has separately entered judgment in favor of Defendants on all counts, allowing Defendants' claim in the amount of $128,835,557.26, and authorizing the holder of such allowed claim to credit bid the allowed claim at any sale of property of the Debtors that is subject to a lien securing such allowed claim.

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

The Court has jurisdiction to hear and determine the causes of action and requests for relief contained in the Complaint pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of the adversary proceeding in this district is proper under 28 U.S.C. §§ 1408 and 1409. Defendants have consented to the entry of final orders and judgments by this Court on all non-core proceedings pursuant to Fed. R. Bankr. Proc. 7012(b).

## FINDINGS OF FACT

1. In the late summer of 2005, Tennenbaum partner Jose Feliciano learned from his partner Steven Chang that Radnor was looking for financing through its placement agent, Lehman Brothers. (Tr. 17:9-15; 18:3-6).

2. Lehman Brothers advised Radnor that a transaction to raise a combination of debt and equity capital was in Radnor's best interests. Radnor was seeking approximately $50 million in new debt and equity capital ($30 million of senior secured debt plus $20 million of convertible preferred stock) to fund an expansion of its growing polypropylene cup business and related working capital. (Tr. 351:3-7; 736:1-4; 876:14-24; 877:1-22; 950:3-12; 953:1-23).

3. Lehman Brothers canvassed the market through a Private Placement Memorandum and contacted 40 potential investors. (Tr. 17:9-24; 33:6-34:22; 232:19-233:22; 1165:15-1166:6; JX 311). Lehman determined that the best strategy was a part

debt, part equity transaction. (Tr. 1211:2-24).

4.      Mr. Finigan testified that management considered a range of options (Tr. 1175:1-22), and believed that liquidation would have provided less value than operating the Company. (Tr. 1176:2-15; *cf.* Tr. 707:6-22).

5.      TCP was chosen among the 40 entities solicited by Lehman because it was willing to move the most quickly. (Tr. 1756:19-1757:5).

6.      The Company's projections showed that it expected to earn $48 million in EBITDA in 2005 and $81 million in EBITDA in 2006. (Tr. 21:24-22:3; 23:20-23; JX 311).    Mr. Feliciano believed that an investment in Radnor was worth further consideration due in part to its potential for sustained growth. (Tr. 200:17-20).

7.      Throughout the late summer and early fall of 2005, TCP engaged in extensive financial, business and legal due diligence. (Tr. 320:7-23; 523:12-524:20; 834-35; 838:16-839:8; 842:22-843:11; 987:8-988:17).    Among other things, it met with Radnor personnel, customers and suppliers to gain a better understanding of the nature of Radnor's businesses and visited Radnor's operating facilities.   TCP also assessed the Company's historical performance to help evaluate whether the Company's optimistic forecasts were justified.   In mid-September 2005, TCP retained FTI Consulting, Inc. ("FTI") to perform accounting due diligence of Radnor's historical financial data.  (Tr. 990:11-19; 991:2-10; JX 58; 1088:6-1090:16).   FTI submitted to TCP its Financial and Accounting Due Diligence Report on October 10, 2005.  (JX 58).

8.      Tennenbaum had no reason to doubt the financial information that was provided by Radnor management.  (Tr. 1092:11-24).   Indeed, while the FTI report disagreed with certain accounting adjustments made by Radnor, the types of accounting

4

adjustments reflected in the FTI report were not in any way unusual or extraordinary. (Tr. 1091:6-13; 1091:23-1092:10).

9.     Radnor exceeded forecasts in 2001 and met forecasts in 2002.  As of October 27, 2005, the only full years it had missed forecasts were 2003 and 2004, the very year the company acquired Polar Plastics, a new line of business for the company, and the next year.  Moreover, the Court credits the testimony of Mr. Palm of Lehman Brothers that as of October 2005, the Company's projections were well thought out "bottoms up" projections and that each assumption was supportable, even if in the aggregate the projections were optimistic.  (Tr. 1748:9-1749:1).

10.     In early October, Mr. Feliciano and his colleagues provided to the Investment Committee a detailed update on TCP's due diligence efforts and gave the Investment Committee the opportunity to consider both the benefits and the risks of making an investment in Radnor.  (Tr. 60:21-61:7; 197:18-24; JX 55).  Mr. Feliciano also presented to the Investment Committee TCP's internal projections for 2006 EBITDA. Although Mr. Feliciano was hopeful that Radnor would reach its projection of $81 million in 2006 EBITDA, he prepared conservative internal projections that considered a "downside" scenario (of $61 million EBITDA) should the Company not perform as expected.  (Tr. 61:12-18; 198:4-21).   The preparation of conservative downside projections is customary for TCP and for many other investment firms.  It does not indicate that TCP expected EBITDA to be at that level.  (Tr. 55:22-56:15).

11.     On October 27, 2005, TCP made its initial investment in Radnor through a commitment to purchase $25 million of Series A Preferred Stock (the "Preferred Stock") and to lend $95 million in senior secured debt to the Company (the "Tranche A and

Tranche B Loans") (Tr. 234:14-235:4). The Tranche A and Tranche B Loans closed on December 1, 2005. (JX 91, 93). They were funded at 99.25% of par. (Tr. 92:22-93:2). The Preferred Stock included detachable warrants that would give TCP the right to own certain levels of Radnor common stock (not to exceed 15.625%), depending on the Company's actual EBITDA performance. (Tr. 496:1-24).

12.     Radnor believed that it would be able to obtain consents from its existing senior secured noteholders in connection with the Tranche A and B loans. That turned out to be incorrect. Thus, Radnor used the TCP loan proceeds to redeem all of the $70 million of senior secured notes. (Tr. 83:17-85:17). In addition, the TCP loan proceeds were used to pay down $4.7 million of equipment loans, pay down Radnor's revolving credit facility and fund working capital and growth initiatives. (Tr. 5-26; 67:1-21; 269:4-21; 397:7-398:15; 402:5-16; JX 91).

13.     On October 27, 2005, TCP entered into an Investor Rights Agreement with Radnor's shareholders. (JX 78). The Investor Rights Agreement included rights often given by an issuer to protect the interests of minority shareholders. (Tr. 1356:23-1358:16). TCP never exercised any of those rights (Tr. 502:5, 503:9) other than the right to designate one member and one observer to Radnor's Board of Directors. (JX 78 §§ 3.1, 3.2.)   Michael Kennedy, Radnor's Chief Executive Officer and its majority shareholder, retained the right to appoint the remaining three directors. TCP designated Mr. Feliciano and Mr. Mehrotra as the representative Board member and observer, respectively. (Tr. 120:22-121:2). Among the rights granted by the Investor Rights Agreement that were not exercised by TCP were veto rights over certain employment agreements and transactions with affiliates, and the right to increase its representation on

the Radnor Board if the Debtors failed to achieve certain EBITDA levels. (Tr. 502:5-8).
Mr. Feliciano testified that the provisions set forth in the Investor Rights Agreement are
"fairly typical" for such an equity investment. (Tr. 205:17-206:19). My experience fully
supports that view. The Investor Rights Agreement reflects a reasonable and appropriate
mechanism for protection of a minority equity interest.

14.    Feliciano testified that TCP did not plan to acquire the Debtors at the time
that TCP made the initial investment in the Debtors, nor at any time thereafter. (Tr.
47:16-22).    There is no reliable evidence to the contrary.    None of the internal
memoranda prepared by TCP when the first investment was made show that TCP had any
intention of buying Radnor. (Tr. 243:23-244:22; JX 40, 66). The TCP memoranda
prepared when the initial investment was made showed that TCP believed that even the
liquidation preference of the Preferred Stock would be paid in a downside scenario, and
that Radnor would comply with the $55m EBITDA covenant for 2006. (JX 55). The
belief that the company could meet its EBITDA targets was shared by those on the
Radnor board. (Tr. 1748:9-1749:1).

15.    TCP received representations from the Company that it was solvent,
including a solvency certificate from the CEO and CFO (Mr. Ridder) of Radnor at the
time of the Tranche A and B loans. (Tr. 112:2-23; JX 91 at p. 14 § (ii), p. 55 § (l)). I
further find that it would be irrational to believe that TCP would have made a $25 million
equity investment if it believed Radnor were insolvent at the time. Tennenbaum's
infusion of $25 million in the form of preferred stock (with warrants and conversion
rights) is a clear indication that Tennenbaum believed that there was an upside to its
investment. If its scheme was a "loan to own" why would it make an equity investment

7

in addition to the debt transaction? The logical alternative would be to make a debt investment only so that Tennenbaum would have a better position in the event of a "downside," i.e., liquidation.

16.     TCP understood in October 2005 that the Company was seeking a capital infusion to fund new product initiatives that were already in place. The Company had already executed agreements regarding new products, like its polypropylene cup line, at the time. (Tr. 39:7-12; 316:3-21; JX 81; 351:3-7; 516:19-517:1; 876:14-878:13; 949:14-954:9; 1048:16-1049:2; JX 58).

17.     The Radnor board of directors believed that the capital infusion sought in June 2005, and occurring in October 2005, was in the best interests of the Company and would be favorable to its capital structure (Tr. 397:21-398:15; 936:16-937:12; 1163:12-1164:17; 1169:13-24). The Board similarly believed that the Tranche A and Tranche B transactions were in the best interests of the Company by providing liquidity to fund new business initiatives and paying down existing debt. (Tr. 1167:10-1169:24).

18.     At all times, Radnor and Tennenbaum treated the Tranche A and B loans as debt investments. (Tr. 239:11-240:10, 577:3-578:11). All internal memoranda from TCP show that the Tranche A and B loans were referred to as debt. (JX 40, 66). The documents themselves contain typical terms and conditions of a secured debt instrument: the Tranche A and B loans provide fixed maturity dates; fixed interest payments; default provisions and common maintenance and incurrence covenants. (JX 91, p. 19, 20, 50; JX 171, § 1.9).

19.     All internal memoranda from TCP both at the time of the Tranche A and B transactions and thereafter demonstrate that TCP's estimate of the "downside" scenario

show that the debt and the liquidation preference of the preferred stock investment would be paid by the enterprise value of the Company. (JX 55; Tr. 60:20-64:5).

20.    The collateral package for the loans under Tranche A and B included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12; JX 71 Annex 1; Ex. 54). Tennenbaum undertook a reasonable process to ascertain the value of its collateral package for the Tranche A and B loans. (Tr. 321:9-322:16; 834:4-835:4). Radnor provided Tennenbaum with appraisals that indicated the collateral available as security for the loans was equal to or greater in value than the outstanding amounts of the loans at the times they were issued. (Tr. 227:12-228:12; 1683:7-10; JX 242; JX 54)

21.    Radnor's capitalization in October 2005 was not clearly insufficient to support a business the size and nature of Radnor's in light of the circumstances at the time the Tennenbaum loans were made. (Tr. 39:4-40:20, 898:9-899:2). At the time of the Tranche A and B loans, Radnor may have been able to borrow a similar amount from another lender, based on the number of interested investors identified by Lehman. (Tr. 33:6-23, 1165:15-1166:6).    Mr.    Kennedy testified that in Lehman's efforts in August/September 2005 it had contacted numerous potential investors and between 20 and 25 such potential investors signed confidentiality agreements to obtain more information from Radnor (Tr. 355:23-356:10). This fact certainly suggests that there were a number of potential investors who, after reviewing the Lehman's August 2005 memorandum, did not believe it was not worth considering the proposed debt and equity investment.

22.    The Debtors' creditors were not harmed by the Tranche A and B loans and

preferred stock investment, but rather benefited from them. The Tranche A and B loans and preferred stock investment by TCP, in the aggregate, decreased Radnor's net debt. (Tr. 104:15-105:5; 241; 534; 939-40; 1674:3-1675:9).

23.     In early 2006, TCP received preliminary indications from Radnor management that the fourth quarter 2005 earnings would be below expectations. (Tr. 512:23-513:11). Mr. Feliciano received the Debtors' actual fourth quarter and year-end results at a Radnor Board meeting held on February 9, 2006. (Tr. 123:10-124:1; JX 117). The numbers were dismal, and defied even the most conservative EBITDA estimates that had been given to TCP by the Debtors in January: $20 million of negative EBITDA in 2005, in contrast to the projection of $48 million of EBITDA that Radnor had used to induce the TCP Lenders to make their investment in Radnor. (Tr. 594:3-9; 23:15-23).

24.     Upon receiving Radnor's fourth quarter results, TCP performed further investigations over the following weeks to get a better understanding of the reasons behind the losses and the nature and extent of the issues facing the Debtors in 2006. (Tr. 1062:13-21; 1065:16-1066:20; JX 133). The Debtors' bank lenders took similar steps, engaging Brandlin & Associates, a forensic accounting firm, to monitor the Debtors. (Tr. 560:3-24; 501:1-4). As part of its investigations, and to better monitor the Debtors' performance, TCP requested that management provide TCP with more detailed and timely financial information. (Tr. 127:16-128:20). In addition to meetings with Radnor personnel, TCP requested that the Company provide it with Daily Performance Reports and borrowing base certificates on a regular basis. (Tr. 127:23-128:10; 132:23-133:4). As part of TCP's investigation in the first quarter of 2006, a group of TCP representatives traveled to Radnor, Pennsylvania in March. (Tr. 1061:20-1062:21; 1081:12-24; 1256:10-

10

20). During this same period, in the interest of protecting the bank lenders, Brandlin & Associates was reviewing Radnor's forecasts (inside information). (JX 223)

25.    Mr. Feliciano provided updates to the Investment Committee on or about February 9, 2006, February 14, 2006 and March 10, 2006, summarizing the team's efforts as they gathered more information about the Debtors' performance. (JX 117, 125, 133). Mr. Feliciano reported that the Debtors blamed the downturn in the fourth quarter on several factors, including higher than expected raw material costs, delays in expected price increases, and a more severe negative impact from the Gulf Coast hurricanes than the Debtors or TCP had ever expected. (JX 133 at 1). Mr. Feliciano remained cautiously optimistic about the Debtors' business prospects based on the anticipated roll-out of new products and advised the Investment Committee that he would continue to refine expectations for the Debtors' 2006 earnings. (JX 133 at 9).

26.    As a result of the devastating decline in earnings in the fourth quarter of 2005 and the first quarter of 2006, the Debtors faced cash flow and liquidity problems and requested an additional advance from TCP to bridge the liquidity gap. (Tr. 529:9-530:20). Given the amount of capital TCP had invested in the Debtors, Mr. Feliciano and TCP were understandably concerned about the Debtors' liquidity issues and performed more diligence, with the assistance of Mr. Mehrotra and Mr. Berry, to evaluate the Debtors' needs and to update the Investment Committee. (Tr. 1062:13-21; 1065:16-1066:10; JX 133).

27.    The unsecured noteholders received a $7.4 million interest payment on March 15, 2006. (Tr. 555:24-556:22).

28.    In a memo to the Investment Committee dated March 28, 2006, Mr.

11

Feliciano and his colleagues reported the results of their investigation, including the Company's plans to stabilize the business, take advantage of the opportunities presented by its new products, and improve performance. (JX 155).

29.    The Company had provided TCP with new projections showing that an additional advance would be sufficient to fund their operations and that, under its revised business plan, the Company expected to earn $60 million in EBITDA in 2006. ((JX 155 at 1). On this basis, Radnor requested that TCP provide an additional $23.5 million to fund what Radnor described as short term liquidity needs. (JX 155 at 8-9).

30.    On April 4, 2006, TCP agreed to make an additional advance (the "Tranche C Loans") in the amount of $23.5 million. (Tr. 426:12-15; 435:23-24; 435:23-436:3; 554:8-10).    The documentation for the Tranche C Loans included (a) an amendment to the Tranche A and Tranche B credit agreement; (b) an amendment to the Tranche A security agreement; and (c) two floating rate secured notes with a fixed maturity date of September 19, 2009. (JX 171, 172). In all material respects, the Tranche C loans had the same terms and conditions as the Tranche A and B Loans, except that the Tranche C Loans could be prepaid without penalty and were subject to an increase in their interest rate if not repaid within one year. (JX 176). The collateral package for the Tranche C Loans included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12).

31.    Radnor had requested that TCP make an additional equity investment in Radnor instead of making the Tranche C Loans but TCP was consistently clear that it would only make an additional debt investment.    (Tr. 416:1-417:15). From Tennenbaum's perspetive an additional equity investment made no sense. It was facing

the prospect of losing its October 27, 2005 preferred stock investment. Why would it put in more equity money? The answer is obvious.

32.    At the time of the Tranche C Loans, Radnor represented that it was solvent. (Tr. 551:17-552:24; 553:1-18; 1366:15-1367:8; JX 179). Messrs. Kennedy and Ridder provided a solvency certificate to TCP on April 4, 2006, representing that Radnor was solvent, taking into consideration both the capital infusion and debt service represented under the Tranche C Loan. (Tr. 112:20-23; 552:3-553:1; 555:23-556:22; 1366-67; JX 139). In connection with preparing the solvency certificate, Mr. Ridder consulted with inside and outside counsel, Messrs. Kennedy and Hastings and PriceWaterhouse. (Tr. 1366:18-1367:2).

33.    Tennenbaum had no reason to doubt the financial information that was provided by Radnor management or the solvency certificates. (Tr. 1092:11-21). All internal memoranda from TCP when the Tranche C Loan was made show that TCP's estimate was that the Company was still solvent. (JX 133, 152; 155).

34.    The Radnor board believed that the Tranche C Loan was in the best interest of the Company and was needed to address a short-term liquidity need. (Tr. 936:16-937:12; 1182:1-21). Mr. Kennedy at all times acted in the best interests of the Company and made decisions that he believed would benefit both Radnor and its shareholders. (Tr. 527:3-17; 528:3-529:22; JX 128).

35.    Mr. Feliciano abstained from voting on the Tranche C transaction. (Tr. 185:14-18; 229:8-21; 1200:17-22; 1678:9-14; JX 165).

36.    The Debtors' creditors were not harmed by the Tranche C loan, but rather benefited from it. (Tr. 936:16; 937:12; 939:9-940:7; 1163:12-23, 1169:1-24). The

13

proceeds from Tranche C were used partly to the benefit of Radnor's unsecured noteholders. Tranche C proceeds were also used to pay down trade debt, but were mostly used for working capital purposes, which assisted the Company's efforts to turn the corner for the benefit of, *inter alia*, unsecured creditors. (Tr. 154:6-24). The notcholders also benefited from the Tranche C loan in the money they received from their consents, described below.

37.    TCP converted $3.2 million of interest due on the Tranche A and B Loans into Tranche C loans, but never received cash from the Company. (Tr. 154:20-24). Aside from reimbursement of out of pocket expenses incurred by its professionals and adequate protection payments, TCP never received a penny in interest or principal payments on the Tranche A, B or C loans before the petition date. (Tr. 154:2-24).

38.    TCP never declared a default based on the failure of the Company to meet the $55 million EBITDA covenant in the Credit Agreement. The earliest date that TCP could have declared a payment default acceleration would have been August 17, 2006. (Tr. 1693:7-1694:8). TCP never declared a default based on the alleged breach of the representation of solvency.

39.    In connection with the Tranche C Loans, the TCP Lenders requested that Mr. Kennedy make a personal financial contribution to the Company to demonstrate Mr. Kennedy's commitment to returning the Company to profitability. (Tr. 430:10-24). Mr. Kennedy also (i) agreed not to receive bonus compensation for calendar 2006; (ii) made a $1 million preferred stock investment in the Company; and (iii) personally guaranteed $10 million of the Tranche C Loans. (Tr. 547:1-6; 547:24-548:6). It would be irrational to believe that  Mr. Kennedy would have done this if he believed that Radnor was

14

insolvent.

40.    TCP and the Radnor shareholders entered into a letter agreement dated April 4, 2006 ("Side Letter") under which the Radnor shareholders agreed that they would cause Radnor to appoint a Chief Operating Officer on or before September 30, 2006. (JX 173, Side Ltr. Pg. 2 ¶4; Tr. 557:14-17). TCP, at Radnor's request, gave up its right under the Side Letter to appoint a Chief Operating Officer of its choosing by agreeing in writing that the appointment of Stanford Springel satisfied the Side Letter. (Tr. 166:3-14). Springel's hiring was due in part to a demand from representatives of the Company's bank group that Radnor hire more senior executives -- not at the insistence of Feliciano or TCP. (Tr. 1190:13-1191:14).

41.    The Side Letter also contains a covenant giving TCP the right to appoint a majority of Radnor's board following a payment default and subsequent acceleration of the TCP Loans. (JX 173; Tr. 558:3-24; 559:4-6). Given the trigger date of the payment default, TCP could not exercise this right earlier than August 17, 2006, and never exercised this right. (*Id.*; Tr. 459:4-9; 1691:16-1692:16; 1693:22-1694:8).

42.    The unsecured noteholders had the right to stop the Tranche C loan from being made because the additional secured loans would have exceeded the maximum "indebtedness" permitted under the unsecured noteholders' Indenture. Radnor therefore solicited the consent of the noteholders to modify the Indenture. On or about April 3, 2004, 95% of the noteholders executed written consents to amend the Indenture, explicitly agreeing to an increase of secured indebtedness in the amount of $25 million. (Tr. 236:8-237:5;426:2-5; 435:23-436:3; JX 167). The price for the consent was $1,350,000. Radnor paid the first half of that fee, $675,000, upon execution of the

consents. (Tr. 235:22-238:15, 533:2-541:22, 937:13-939:8, 1177:13-1178:2, Ex. 167). The consent of the noteholders is, in my view, clear evidence of the acknowledgment that the Company had serious liquidity problem and that the Tranche C secured debt transaction had the prospects of a solution to that problem.

43.    The consents that the unsecured noteholders signed acknowledged that Tranche C was a debt investment, referring to the need for additional "indebtedness." (Tr. 533:2-541:22; JX 167).

44.    Article Seven of Radnor's Certificate of Incorporation provides that Radnor's directors cannot be liable for a breach of the duty of care. (JX 350).

45.    Feliciano was a valuable member of the Radnor board and consistently acted in the best interest of Radnor. (JX 127; 1173:2-9). His conduct was confirmed by all other members of the Radnor board, who testified that he was a productive and valuable member of the board who made helpful suggestions and was interested in the welfare of Radnor. (Tr. 524:1-20; 527:3-17; 573:8-21; 577:7-15; 943:2-944:21; 1171:14-1173:9; 1187:8-24).

46.    TCP appointed one board member out of a total of four, and did not control the Debtors' affairs. (Tr. 519:8-10; 576:13-577:15; 847:3-11). Neither TCP nor Feliciano ever controlled Radnor's operations. (Tr. 167:18-168:9; 171:3-173:13; 205:17-206:24; 241:2-242:11; 576:13-577:15; 602:12-604:8; 847:3-11). Kennedy, as majority shareholder and CEO, controlled Radnor at all times. (Tr. 43:13-44:20, 167:18-168:9, 171:3-173:13). TCP's board of directors seat flowed from its preferred equity investment. (Ex. 78, pg. 18 ¶ 3.1). For a minority shareholder to hold a seat on the board of directors is not uncommon. (Tr. 496:4-12, 929:14-930:23, 1171:14-1173:9). No one at

16

TCP ever exercised control over the Radnor board of directors. (Tr. 231:4-22, 459:4-9, 558:3-559:9). The Committee makes much of the fact that the Radnor board minutes show that in house counsel for Tennenbaum (Mr. Hollander) attended a board meeting (JX 214). On its face this suggest no impropriety by Tennenbaum or Radnor but the Committee has offered no explanation of any possible wrongdoing. Presumably, he was invited to advise on the restructuring matters and it is clear that Radnor's board (controlled by insiders) was in need of all the help that it could get.

47.      There is only one financing transaction included in the Committee's complaint that occurred while Mr. Feliciano was a member of the Radnor board: the Tranche C loan. (Tr. 929). Feliciano abstained from voting on the Tranche C Loan. (Tr. 1200:8-22; JX 165).

48.      As of April 13, 2006, the Debtors were still providing guidance to their public investors that they expected to earn \$45-50 million in EBITDA in 2006. (Tr. 598:10-599:2). Unfortunately, these projections proved to be wrong, and the Debtors fell short of their business plan. Within approximately three weeks of the Tranche C Loans, the banks under the Company's revolving credit facility determined that the borrowing base information provided to them had been inaccurate, and that their loans were overadvanced. (Tr. 441:18-442:10). The loss of liquidity caused by the recalculation by the banks of the borrowing base was exacerbated by continued failures by Radnor to meet its projections.

49.      During June 2006, Radnor's revolving lenders threatened to cut off funding under its working capital facility (Tr. 441:18-442:10), and did so in July 2006, which left the Company with no alternative but to file these bankruptcy cases. Thus,

TCP transactions did not cause the bankruptcy cases.

50.    The Debtors requested that TCP provide a stalking horse bid on terms that would ensure the highest and best offer for the Debtors' assets. (Tr. 177:3-15; 576:2-12). The TCP Lenders were reluctant to do so, but were convinced by the Debtors that without such a bid, there would likely be a "free-fall" bankruptcy, resulting in a chapter 7 instead of chapter 11 and attendant loss of value. (Tr. 1486:6-1487:4; 1736:11-14; 1738:15-1739:8). Thus, TCP reluctantly agreed to act as the stalking horse bidder, which led to negotiations on the Asset Purchase Agreement ("APA") dated August 21, 2006. (Tr. 177:3-178:17; JX 287).

51.    Feliciano had already resigned from the Radnor board when the APA was negotiated in July and August of 2006 and did not pressure Radnor's other directors to approve it. (JX 287; Tr. 176:5-8; 576:1-24; 599:1-24; 1683:7-10; JX 242). Radnor approached TCP, not the reverse. (Tr. 529:2-22; 574:1-7; 1476:4-11). Indeed, rather than Mr. Feliciano twisting the board's arm to engage in sweetheart deals with TCP, (a) TCP entered into a forbearance agreement in July 2006 for no fee when Radnor failed to make an interest payment (Tr. 1466:5-1467:14; JX 260); (b) agreed to subordinate a portion of its secured debt to the revolving lenders (also for no fee) (JX 259) and (c) the APA was only reached after what Mr. Springel, the independent COO and later independent CRO, characterized as "spirited and arms length negotiations." (Tr. 1478:4-22; 1487:2-23).

52.    The Radnor board believed that the APA was in the best interest of the Company and its constituents. (Tr. 941:22-942:15; 1515:20-1516:21). The Court previously ruled, in its bidding procedures order, that the decision to enter into the APA

was "in the best interests of the Debtors, their estates, their creditors, and all other parties in interest." (Dkt. 144 at p. 2). The Court has previously ruled that the Committee has waived the right to object to the sale process. (Dkt. 144 at ¶ 1). At the bid procedure hearing on September 22, 2006, Radnor's counsel proffered the testimony of Mr. Shapiro on behalf of Lehman Brothers and Mr. Springel as Radnor's CRO in support of the bid procedure order. The Committee did not cross examine either witness or otherwise object to their testimony. I specifically herein incorporate by reference the testimony offered by Mr. Shapiro (Doc. # 369 at pp. 43 through 45) and Mr. Springel (Doc. # 369 at pp. 47 through 52). Indeed, at the September 22, 2006 hearing the Committee's counsel "supported" the bidding procedures order. (Doc. # 369, p. 71).

53. Radnor provided any party interested in bidding on the Debtors' assets in the bankruptcy cases with material non-public information if they agreed to sign a confidentiality agreement. (Tr. 487:6-488:11).

54. There is no evidence showing that TCP or Mr. Feliciano ever used insider information in an inappropriate manner.

55. On August 22, 2006, TCP filed the Declaration of Jose Feliciano, to which was attached the Credit Agreement, guaranties, security agreements, and all lien and security interest filings, evidencing Tennenbaum's claims. (Dkt. 27). On September 12, 2006, TCP filed its proof of claim in the amount of $128,835,557.26 (as of the Petition Date), to which was attached the Feliciano Declaration and all exhibits, as well as a detailed breakdown of components of the proof claim. (Dkt. 156). The proof of claim included copies of properly recorded mortgages, fixture filings and UCC financing statements. (Dkt. 156). The Committee did not submit any evidence contradicting the

validity or enforceability of the liens and security interests securing such claim. The proof of claim is secured by all collateral described therein.

56.     The only evidence before the Court shows that the collateral securing the Tennenbaum claim was valued at more than $132.2 million (JX 54; 71, Annex 1), more than Tennenbaum's $128.8 million petition date claim.

57.     The Committee's Complaint challenges as a preference an interest payment made on April 4, 2006. This payment is outside the 90-day preference period. Thus, the Committee asserts that Tennenbaum was an insider. I find that Tennenbaum was not an officer, director, or partner of the Debtors, nor a relative of any of them, and Tennenbaum also never held 20% of the voting securities of the Debtors. At the time of the making of the interest payment on April 4, 2006, Tennenbaum held no voting securities of the Debtors.

58.     Tennebaum was not a "person in control of the Debtor." Kennedy, not Tennenbaum, was in control of the Debtors. *See* FOF 46.

59.     Tennenbaum delivered $23.5 million as an additional Tranche C advance under the Credit Agreement, of which $3.2 million was credited as a payment of interest on the pre-existing Tranche A and B debt. Therefore, the net effect was new value in excess of $20 million. Thus, the Debtors' estates were enhanced by this infusion of new value. Tennenbaum was never repaid this $20 million.

60.     Both the Debtors and Tennenbaum intended that the $3.2 million interest payment be part of a contemporaneous exchange. Two documents executed by the Debtors and Tennenbaum clearly evidence that intent. On March 15, 2006, the Debtors and Tennenbaum agreed in writing that the $3.2 million interest payment due that day

would be paid in connection with the funding of the Tranche C loan several weeks later. (Tr. 554:8-15; 556:11-22; 842:4-10; 1673:17-23; JX 139; JX 171 § 1.4). The final documentation of the Tranche C loan, Amendment No. 1 to the Credit Agreement, expressly provided that net proceeds of the Tranche C loan would be used to make the interest payment on the Tranche A and B loans due on March 15, 2006. (Tr. 441:14-17; 554:8-15; JX 171 § 1.4). Thus, the parties intended that the interest payment and the new value delivered by Tennenbaum would be contemporaneous exchanges.

61.    The transfer of the interest payment by the Debtors and the delivery of new value to the Debtors, were contemporaneous. They occurred electronically at the exact same moment. On April 4, 2006, Tennenbaum actually delivered to the Debtors an amount equal to only the Tranche C loan of $23.5 million *minus* the $3.2 million interest payment which Tennenbaum credited as payment of the Tranche A & B interest payment.

62.    The Committee makes much of the "thank you" e-mail sent by Mr. Ridder to Mr. Feliciano (JX 275). This is the only evidence that the Committee presented to suggest a sub rosa arrangement between Radnor (or any employee of Radnor) and Tennenbaum leading up to the Asset Purchase Agreement.    However, Mr. Ridder explained in detail at the trial and in his prior deposition that this comment was made in the context of Mr. Feliciano's comment during a conference call that Radnor's financial group would be treated fairly in a transition. (Tr. 1307:17-1308:17). This does not support a conclusion that there was any improper dealings between Mr. Ridder and Tennenbaum leading up to the Asset Purchase Agreement. Mr. Springel confirmed that these "assurances" were nothing more than a reference to the transition arrangement and severance payments. (Tr. 1451:18-1452:6; 1452:18-1453:3). Mr. Springel was involved

21

in the conference call and testified that nothing improper occurred. (*Id.*; Tr. 1455:701456:20). As to whether there were any promises of employment, Mr. Springel emphatically said "absolutely not." (Tr. 1457:3-5).

63.    On June 14, 2006 Lehman was retained to assist Radnor in assessing various alternatives for solving the liquidity crisis. With that imput, Mr. Springel concluded that a sale transaction was the most doable of the alternatives.

64.    The Committee implies an impropriety in Radnor's retention of Lehman Brothers in June 2006 because of Lehman's prior dealings with Tennenbaum. Lehman's long term relationship with Radnor made it a logical choice for Mr. Kennedy to pick as a financial advisor at the time of the financial crisis in the Spring of 2006. Furthermore, given Lehman's role in the August 2005 search for capital, and therefore its knowledge of the Company, this would seem like a logical selection by Radnor in June 2006. Mr. Feliciano understandably could have also believed that Lehman would be a logical choice for the engagement. It would follow that he saw no reason to inform Mr. Kennedy of Lehman's prior dealings with Tennenbaum on totally unrelated matters, assuming he was aware of them at the time. With respect to the late disclosure by Lehman of its prior relationship with Tennenbaum, Mr. Shapiro (Lehman's manager leading the engagement) testified that even if he had been aware of it at the time of his application for retention, he would have still sought the engagement. In my view, he rightly could have.

65.    Mr. Springel testified that the sale process was "full and fair" and no favorable treatment was given to Tennenbaum in the sale process. (Tr. 1543:4-11). The Committee focuses on the transition schedules developed by Mr. Ridder and sent to Tennenbaum but not put into the data room as evidence of an unlevel playing field. Mr.

Springel testified that this transition schedule was not an important matter and that other bidders could do their own administrative cost analysis based upon data available in the data room. (Tr. 1523:19-1524:19).

## CONCLUSIONS OF LAW

### Recharacterization

1.    The Court rules against Plaintiff and in favor of Defendants on Counts I and II of the Complaint and concludes that the Tranche A, Tranche B and Tranche C Loans are true debt instruments and should not be recharacterized as equity. Taking into account the terms of the documents themselves, the facts and circumstances surrounding the making of the loans, the reasonable inferences to be drawn therefrom, as well as the economic reality of the circumstances, the Court concludes that, at the time of the transactions, the parties intended that the transactions were debt transactions and not equity.

2.    In *In re: SubMicron Systems Corp.*, 432 F.3d 448 (3d. Cir. 2006), the Third Circuit explicitly rejected a "mechanistic" approach to the analysis of a recharacterization claim, under which the court weighs certain factors. Rather, the Court held that the overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by a applying any specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction:

> [C]ourts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.    That intent may be

23

> inferred from what the parties say in their contracts, from what
> they do through their actions, and from the economic reality of
> the surrounding circumstances.  Answers lie in facts that confer
> context case-by-case.

*Id.* at 455-456.

3.      The comprehensive analysis of "intent" adopted by the Third Circuit in *SubMicron*, leads this Court to conclude that Radnor and TCP intended that the Tranche A, Tranche B and Tranche C Loans were true debt investments.  Considering the facts and circumstances surrounding the TCP Loans, as well as the reasonable and logical inferences drawn therefrom, the Court finds that the Tranche A, B and C loans were intended to be and were true debt and not equity.  No evidence contradicts this intent. *See* FOF 18, 31.

4.      Even were the Court to divine the parties' intent by applying the variety of factors considered by other courts in recharacterization cases, the Court's decision not to recharacterize the TCP Loans would be the same.  The Court finds that the TCP Loans (a) are referred to as "debt" and/or "indebtedness" in the transaction documents; (b) were consistently referred to by all parties as "loans" and/or "indebtedness"; (c) contained a fixed maturity date of September 15, 2009; (d) gave TCP the right to enforce the payment of principal and interest; (e) contain no "voting rights"; (f) were treated as priority debt instruments, the proceeds of which were used for working capital and to replace and/or pay down existing debt; and (g) are secured interests given priority in a liquidation or insolvency. *See* FOF 18, 20. *See also SubMicron*, 432 F.3d at 456 n.8.

5.      TCP's knowledge that the Debtors were experiencing a liquidity crisis when the Tranche C Loans were made (*see* FOF 26-27) is insufficient to support recharacterization. The *SubMicron* Court expressly considered this issue and rejected

recharacterization because it found that it was legitimate for an existing lender to extend additional credit to a distressed borrower as a means to protect its existing loans. *See SubMicron,* 432 F.3d at 457 ("[W]hen existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."); *In re AutoStyle Plastics,* 269 F.3d 726, 748 (6th Cir. 2001). Thus, the Court is not persuaded by the Committee's allegation in its complaint that "no prudent lender" would have made the TCP Loans.

      6.     Although not determinative of the issue of recharacterization, the Court further concludes that TCP did not exercise control over Radnor's day-to-day operations. *See* FOF 46. Mr. Feliciano's designation as a member of Radnor's four-member Board of Directors is immaterial. In *SubMicron,* the Third Circuit refused to recharacterize the debt as equity notwithstanding that the debtors' largest secured creditors held half of seats on the debtor's board. *See id.,* 432 F.3d at 457-58 (it is "not unusual for lenders to have designees on a company's board, particularly when the company [is] ... distressed."). The Court therefore holds that Mr. Feliciano's role as one of four members of the board does not weigh in favor of recharacterization.

      7.     TCP's receipt of non-public information and *ability* to obtain more board seats is similarly immaterial. TCP never exercised its rights to obtain additional representation on the Radnor board. *See* FOF 13. The mere "right" or "ability" to control, without exercising that control, does not constitute the level control relevant to the issue of recharacterization. *See* COL 12. Mr. Feliciano's participation in board

meetings, and TCP's receipt of information, were consistent with good faith efforts to provide valuable advice to the Debtors and to conduct due diligence.

8.    The Court rejects the Committee's claim that TCP exercised undue "control" over Radnor due to the EBITDA covenants in ¶44 of the Credit Agreement. There is no evidence in the record to support the Committee's belief that TCP "knew" that Radnor could not and would not attain the EBITDA levels set forth in that agreement. Furthermore, the evidence does not support the Committee's claim that TCP exercised undue control over Radnor through the warrant matrix calculations based on Radnor attaining certain levels of EBITDA. The fact that TCP negotiated the acquisition of warrants for Radnor equity should the Company fail to meet certain projected EBITDA levels is unremarkable and did not constitute "control."

<u>**Equitable Subordination**</u>

9.    Although the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest," 11 U.S.C. § 510(c)(i), equitable subordination is "drastic" and "unusual" remedy. *In re SubMicron*, 291 B.R. at 327, 329; *see also In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 117 (E.D. Pa 1993) (equitable subordination is an "extraordinary" departure from the "usual principles of equality of distribution and preference for secured creditors") (citations omitted).

10.    The Committee failed to meet its burden of proving that (a) TCP engaged in inequitable conduct; (b) the misconduct caused injury to Radnor's creditors or conferred an unfair advantage on TCP; and (c) equitable subordination of the claim is not inconsistent with the Bankruptcy Code. *In re Citicorp Venture Capital, Ltd.,* 160 F.3d

982 (3d Cir. 1998); *see also SubMicron*, 432 F.3d at 462. Furthermore, the Court holds that TCP did not engage in "egregious conduct" tantamount to "fraud, overreaching or spoliation." *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002); *In re Epic Capital Corp.*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

11. TCP was not an insider for purposes of equitable subordination, as it was not a "person in control of the debtor." 11 U.S.C. § 101(31)(B)(iii).[1] Evidence that TCP monitored the Company's business and attended Board Meetings is insufficient; the Committee failed to prove that TCP exercised "day-to-day control" over Radnor's business affairs and dictated Radnor's business. *See In re Winstar Communications, Inc.*, 348 B.R. 235, 279 (Bankr. D. Del. 2005) ("[t]here must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.).

12. TCP's access to performance reports and other financial information from the Company is insufficient to establish insider status. *See, e.g., In re Armstrong*, 231 B.R. 746, 750 (Bankr. E.D. Ark. 1999) ("[e]ven if the bank requires the debtor to submit frequent reports on receivables, invoices, and operations, receives all payments on the receivables, has the power to endorse checks, and obtain concessions from the debtor, the bank is not thereby an insider <u>because there is no control of the day-to-day decision making of the debtor</u>.") (emphasis added); *In re Optical Technologies, Inc.*, 252 B.R.

---

[1] The Court also holds that TCP's role does not support "insider" status under the other provisions of 11. U.S.C. § 101. *See* 11 U.S.C. § 101(31)(B) (defining "insider" as (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; or (vi) a relative of a general partner, director, officer, or person in control of the debtor.); 11 U.S.C. § 101(31)(E) (insider may include an affiliate or an insider of an affiliate of the debtor); 11 U.S.C. § 101(2) ("affiliate" includes and entity that owns, controls, or holds power to vote 20% or more of the debtor's outstanding voting securities). The fact that Mr. Feliciano was a board member does not make TCP an insider. *See In re Boston Publ'g Co., Inc.*, 209 B.R. 157, **169-70** (Bankr. D. Mass. 1997) (person who was both a shareholder and a creditor of a debtor and who designated a board member was not an insider).

531, 539 (M.D. Fla. 2000) (to be determined a person in control, the person must control the company so as to dictate corporate policy and disposition of corporate assets <u>without limits</u>") (emphasis added).    Indeed, National City Bank also received non-public information from Radnor on a regular basis. *See* FOF 27.

13.    TCP did *not* engage in misconduct; TCP did *not* seek to benefit itself at the expense of others; TCP did *not* seek to mislead trade creditors, public noteholders or other stakeholders.    TCP at all times acted in good faith with a view to maximize Radnor's value to all constituents.    The testimony on these issues was consistent and credible.    Furthermore, no member of the Committee appeared at trial to offer testimony inconsistent with the foregoing conclusions.

14.    Principles of equity require a finding that the Loans should not be subordinated. The Loans advanced by TCP enhanced liquidity of the Company and, among other things, allowed the Company to continue operations.    Contrary to the central theme of the Committee's case, the preferred stock transaction and the Tranche A and Tranche B loans resulted in a reduction of the Company's net debt. *See* FOF 22.    Further, the unsecured bondholders expressly consented to the Tranche C Loans. *See* FOF 43-44.

15.    Even were TCP's conduct viewed under the more stringent standards applied to insiders, the Court holds that the Committee has failed to prove that TCP engaged in wrongful conduct such as (a) fraud, illegal conduct or a breach of fiduciary duty; (b) undercapitalization; and (c) use of the Debtor as a mere instrumentality or alter ego. *Mid-American Waste,* 284 B.R. at 70; *See, e.g., In re Epic Capital,* 290 B.R. at 524; *In re M. Paolella & Sons,* 161 B.R. at 118.

## Breach of Fiduciary Duty Claims

## A. Claims Not Pled or Dropped After Trial.

16.    The Committee **tried this case** as if it were a "deepening insolvency" case. Presumably, none of the Counts of the Complaint were denominated "deepening insolvency" due to the recent rejection of such a cause of action under Delaware law. *See Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168 (Del. Ch. 2006); *see also Seitz v. Detweiler, Hershey & Assoc. (In re CitX Corp.)*, 448 F.3d 672 (3d Cir. 2006) (rejecting deepening insolvency as a theory of damages). However, simply calling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster. As I conclude below, the *Trenwick* opinion made quite clear that under Delaware law, a board is not required to wind down operations simply because a company is insolvent, but rather may conclude to take on additional debt in the hopes of turning operations around. *See* COL 23.

17.    I further conclude that deepening insolvency fares no better as a cause of action directly against Tennenbaum than it would against Radnor's board. As the Third Circuit discussed in *CitX*, stock investments like TCP's $25 million preferred stock investment lessen insolvency rather than increasing it. *CitX*, 448 F.3d at 677.

18.    Moreover, the *CitX* court noted that the making of a loan similarly does not increase insolvency; it increases liabilities (the amount of the loan) and assets (the cash provided by the loan) in the same amount. *Id.* at 677 (citing Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 552-57 (2005)). I find the Third Circuit's conclusion particularly relevant here: "Any later increase in insolvency (*i.e.*, the several million dollars of debt incurred after the ... investment) was wrought by *CitX*'s management, not by Detweiller." *CitX*, 448 F.3d at 677. No matter how the

Committee titles its causes of action, the holding of *CitX* defeats the claim.

19.     I also note that the Committee dropped after trial all of its causes of action for the breach of the duty of care. Undoubtedly, it did so because Article Seventh of Radnor's Certificate of Incorporation (**JX** 350) exculpates Radnor's directors from liability for breach of the duty of care, a permissible provision pursuant to 8 *Del. C.* § 102(b)(7). Section 102(b)(7) provisions act as a complete bar to liability even when creditors or a trustee, rather than stockholders, are suing derivatively. *Production Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772 (Del. Ch. 2004); *Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005).

20.     However, the fact that the Committee has dropped its duty of care claims does not render Article Seventh and § 102(b)(7) meaningless to this case. To the contrary, much of the Committee's case at trial at best would have implicated the duty of care, not the duty of loyalty. By way of example only, if the Radnor board should not have approved a $55 million EBITDA maintenance covenant because that number was too high (and the Court need not and does not make such a finding here), it did not do so in bad faith; rather, the only potential breach would have been in not understanding that the Company's projections were optimistic and that the maintenance covenant, set at the $55 million level, ran too high of a risk of causing a default. That is a quintessential duty of care claim. Simply alleging that Mr. Kennedy desired funding at any cost does not convert this claim into one implicating the duty of loyalty. Thus, Article Seventh and § 102(b)(7) would have barred any such claims against the board, and Tennenbaum and Mr. Feliciano therefore could not have possibly been held liable for aiding and abetting such claims.

30

**B.**   **Aiding and Abetting Claim.**

21.   TCP never aided and abetted a breach of fiduciary duty. The elements for aiding and abetting a breach of fiduciary duty under Delaware law are as follows: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 584 (Del. Ch. 1998). The evidence does not support a finding that any of these elements have been satisfied.

22.   Even if the Debtors were insolvent at the time of the Tranche A, B and C transactions, the Radnor Board's actions would not have breached any fiduciary duties owed to the Debtors' unsecured creditors. As the Court of Chancery acknowledged in *Trenwick*, Delaware law does not impose an absolute obligation on the board of an insolvent company to cease operations and liquidate. *See Trenwick*, 906 A.2d at 204. Rather, directors of an insolvent company may pursue strategies to maximize the value of the company, including continuing to operate in the hope of turning things around. *See id.*; *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997) (permitting board of company within days of a bankruptcy filing to incur new secured debt in aid of funding risky but promising new products over the objection of preferred stockholders with liquidation preference). Specifically, the Court in *Trenwick* stated as follows:

> If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

31

*Trenwick*, 906 A.2d at 205 (emphasis supplied). Thus, "the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm." *Id.* at 196 n. 75.

23.    The Court holds that the Radnor Board did not act disloyally in entering into the transactions with Tennenbaum. *See* FOF 3, 4, 17, 34. Given the company's prospects with its new products, the advice of competent financial advisors and the consideration of the board, I find no basis in the record for the Committee's repeated assertion that Mr. Kennedy was "swinging for the fences" just to protect his equity investment, rather than acting in the best interests of the company and its stakeholders. Indeed, the Court notes that Mr. Darr's concession that had the company liquidated in October 2005, even without considering transaction costs, such liquidation would have ensured a substantial loss for unsecured creditors (Tr. 670-71), provides a good faith basis for the Radnor board to have continued with its business plan rather than shutting down prematurely.

24.    The Radnor Board's good faith decisions to enter into the subject transactions with Tennenbaum to aid Radnor in carrying out its business plan are afforded the protection of the business judgment rule. Radnor's business judgment against liquidation and in favor of attempting to continue operations and continue with its business plan of expansion was not inherently wrongful. *See Official Comm. of Bond Holders of Metricom, Inc. v. Derrickson*, 2004 WL 2151336 (N.D. Cal. Feb. 25, 2004) (even in the zone of insolvency, it is not a breach of fiduciary duty under Delaware law to

carry out the company's business plan).[2]

25.    The Court also rejects the Committee's argument that TCP aided and abetted the board's breach of fiduciary duty of accepting TCP's stalking horse bid. That argument is precluded by the law of the case, since the Bidding Procedures Order already approved the stalking horse bid as in the best interests of the estates. FOF 52; *see also In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002) (law of the case doctrine "limits relitigation of an issue once it has been decided.").

26.    Additionally, the Committee has failed to demonstrate "knowing participation" on the part of Tennenbaum in any breach. Tennenbaum was a participant in the complained-of transactions, but that fact alone does not subject it to liability for aiding and abetting breaches of fiduciary duties. *See HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 121 (Del. Ch. 1999) (aiding and abetting claim must be supported by proof of an understanding between the parties "with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties"). Rather, a plaintiff must prove that the defendant knowingly participated not just in the transactions but in the breach of fiduciary duties. *See id.; Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (to satisfy the "knowing participation" element, a plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].") Tennenbaum reasonably relied on the Debtors' officers' representation that the Debtors were solvent at the time that the transactions at issue were entered into. *See* FOF 15, 32, 33. Given this representation, Tennenbaum would have

---

[2] In this respect, the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are not named as defendants. The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers were not named as defendants.

had no reason to know that fiduciary duties were even owed to creditors, much less that they were breached. *See* COL 22.

## C.    Claims Against Mr. Feliciano For Breach of Duty of Loyalty.

27.    The Court holds that Mr. Feliciano did not breach his duty of loyalty. The Committee has failed to prove that Mr. Feliciano was interested in any transaction and voted in favor of it due to his outside financial interests rather than voting in the best interests of Radnor. *Cede & Co. v. Technicolor Inc.*, 634 A.2d 345, 363 (Del. 1993) ("to establish a breach of duty of loyalty, [plaintiff] must present evidence that the director either was on both sides of the transaction or 'derive[d] any personal financial benefit from it in the sense of *self-dealing*, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'") (emphasis in original).

28.    Indeed, the Committee only complains of two transactions that occurred after Mr. Feliciano became a director. In connection with the first, the Tranche C Loan, the record evidence is that Mr. Feliciano *abstained* from the vote. (*See* FOF 35, 47). The second is the stalking horse bid. The record reflects that Mr. Feliciano resigned from the board in June 2006 (*see* FOF 51) and that Radnor first approached Tennenbaum about making a stalking horse bid in July. (Tr. 1476). Simply put, Mr. Feliciano did not vote on either transaction, much less vote in his self interest. Nor does the record support that Mr. Feliciano used his board seat to pressure the other directors into the Tranche C and stalking horse deals. *See* FOF 51.

29.    To the extent the Committee relies on Tennenbaum's prior relationship with Lehman Brothers, or Mr. Feliciano's failure to disclose the prior relationship to the board, as support for this claim, the Court concludes that the prior relationship did not

present an actual conflict. Nor is there evidence to support that the prior relationship had any influence on Lehman's conduct, provided an advantage to Tennenbaum, or resulted in any damage to any constituency. Both Mr. Feliciano's and Lehman's Mr. Shapiro's testimony about this issue – in particular the extent and tenuous nature of the prior relationship – is consistent with the Court's conclusion.

30.    I likewise find no merit in the separate allegation that Mr. Feliciano breached his duties by using his knowledge to bid on the assets of Radnor in this bankruptcy case. As a matter of law, there is no *per se* breach of fiduciary duty for an insider making a bid to purchase a company or its assets. Were it otherwise, every management led leveraged buyout would be a *per se* breach of fiduciary duty, yet the Delaware courts have held otherwise. *See, e.g., In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003); *Lewis v. Leaseway Trans. Co.*, 1990 Del. Ch. LEXIS 69 (Del. Ch. May 16, 1990). Moreover, as noted above, it is the law of the case that it was in the Debtors' interest to enter into the stalking horse bid. (COL 26). Therefore, there can be no breach of duty by Mr. Feliciano in using information about Radnor in formulating that bid, since that bid helped Radnor.

### Disallowance of Proof of Claim

31.    The proof of claim filed by Tennenbaum established the *prima facie* validity of the Tennenbaum claim in the amount of $128,835,557.26 as of the petition date, plus post petition accruals and expenses referred to therein. *See* Fed. R. Bankruptcy Procedure 3001(f) ("a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim"). *See also In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) ("Initially, a

claimant must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Bankruptcy Rule 3001(f)"). Thus, Tennebaum has met its burden of proof, and its proof of claim is allowed until an objection supported by substantial evidence is presented to the Court. *See In Re Mid-American Waste Systems, Inc.*, 284 B.R. 53, 65 (Bankr. D. Del. 2002) (party objecting to properly filed proof of claim bears the initial burden of presenting sufficient *evidence* to overcome the presumed validity and amount of claim); *Brown v. IRS (In re Brown), 82 F.3d 801 (8th Cir. 1996)* (a claim's presumptive validity is not altered unless an objection is supported by *substantial evidence*). The Committee has offered the Court no evidence, let alone substantial evidence, contesting any component of Tennebaum's claims. Accordingly, Tennebaum's proof of claim is allowed, as of the Petition Date, in the amount of $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

32.     The Court's Bid Procedures Order (Dkt. 144) provided that Tennenbaum would be allowed to credit bid its allowed claim to the full extent allowed by Bankruptcy Code Section 363(k). Accordingly, Tennenbaum is authorized to credit bid the full amount of its claim, in an amount equal to $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

### Avoidance of Liens

33.     The proof of claim filed by Tennenbaum in the amount of $128,835,557.26 as of the petition date included copies of properly recorded mortgages,

36

fixture filings and UCC financing statements. *See* FOF 55. The Committee submitted no evidence contradicting the validity or enforceability of the liens and security interests securing such claim. Once a secured creditor shows its properly filed financing statements, it has established a *prima facie* secured claim; and a secured creditor is not required to show that its security interests are not voidable in order to establish its secured status. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991).

34.    Thus, I hold that Tennenbaum met its initial burden of proof with respect to its liens and security interests, and because the Committee submitted no substantial evidence contradicting such liens and security interests, Tennenbaum need present no further proof of the validity and enforceability of its liens and security interests.

**Preference Claim**

35.    Under Bankruptcy Code Section 547(b)(5), the burden of proof is on the Committee to show that Tennenbaum was under-secured. *In re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 963-64 (9th Cir. 2001) (to prove section 547(b)(5) element of preference, trustee must prove that transferee was undersecured); *In re Lease-a-Fleet, Inc.*, 151 B.R. 341, 348 (Bankr. E.D. Pa. 1993) (plaintiff in a preference action must prove defendant is unsecured or undersecured); *In re O'Neill*, 204 B.R. 881, 892 (Bankr. E.D. Pa. 1997) (same). Section 547(b)(5) is not a defense to a preference; rather it is a fundamental component of the case-in-chief of a preference claim, and, under Section 547(g), the burden of proof on every element of Section 547(b) is on the Committee. *Mellon Bank, N.A. v. Metro Comms., Inc.*, 945 F.2d 635, 642 (3d Cir. 1991); *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 107 (Bankr. D. Del. 2006) (trustee must

establish each element of section 547(b), including section 547(b)(5)); *In re IT Group, Inc.*, 331 B.R. 597, 601 (Bankr. D. Del. 2005) (creditor's committee, as plaintiff, had burden of proving each of the elements under 547(b)).

36.    The Committee offered no evidence at all on the issue of the value of the collateral securing Tennebaum's claim.    The Court finds that the only competent evidence admitted at trial shows that the collateral securing the Tennenbaum claim was valued at more than $132 million (FOF 56), millions of dollars more than Tennenbaum's $128.8 million petition date claim.    Therefore, the Committee has failed to meet its burden of proof.

37.    Additionally, the Court concludes that the interest payment at issue was made on April 4, 2006, outside the 90-day preference period. Therefore, the payment is a preference only if  Tennenbaum was not insider for the purpose of the one-year reachback period of Section 547(b)(4)(B).    However, I already have concluded that Tennenbaum was not an insider. *See* COL 11.

38.    Whatever influence Tennenbaum exerted on the direction of the Debtors was indirect, arising from the covenants and other provisions Tennenbaum contracted for in the Credit Agreement, which is not sufficient to turn a secured lender into an insider of the Debtors.  Reasonable financial controls negotiated at arms' length between a lender and a borrower does not transform a lender into an insider. *See In re Winstar Comm., Inc.*, 348 B.R. 235, 279 (Bankr. D. Del. 2005) (there must be *day-to-day control*, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake); *In re Octagon Roofing*, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991) (exercise of financial control by a creditor over a debtor which is incident to the

creditor-debtor relationship, does not make the creditor an insider); *In re Huizar*, 71 B.R. 826, 832 (Bankr.W.D. Tex. 1987) (creditor-lending institutions must be able to exercise a reasonable amount of debtor control without fear of being labeled an insider). Similarly, the mere opportunity to exercise control, if not exercised, also does not make a creditor a person in control of a debtor. *In re Wescorp, Inc.*, 148 B.R. 161 (Bankr. D. Conn. 1992); *In re Technology for Energy Corp.*, 56 B.R. 307, 316 (Bankr. E.D. Tenn. 1985) (defendant held not to be an insider where it attained control of Debtors' voting stock but did not exercise such power); *In re Piece Goods Shop, Co., L.P.*, 188 B.R. 778 (Bankr. M.D.N.C. 1995) (because right to elect directors was never exercised, defendant held not to be an insider).

39.     The Court also finds that the interest payment cannot be avoided for an additional reason:  it was made in connection with a contemporaneous exchange with Tennenbaum, in which Tennenbaum provided more than $20 million of net new value to the Debtors, and the parties clearly intended such interest payment and new value to be a contemporaneous exchange. *See* FOF 59. Under Bankruptcy Code Section 547(c)(1), a transfer is not a preference if it was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."

40.     A creditor provides new value when it makes a loan to the debtor. *In re Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1091 (5th Cir. 1994). Tennenbaum's delivery of more than net $20 million to the Debtors on April 4, 2006 as an additional advance under the Credit Agreement is new value for the purposes of Section 547(c)(1). Even if some of the new value is used by a debtor to pay pre-existing debt, the transfer falls within the

four corners of 11 U.S.C. § 547(c)(1) if the amount transferred to the debtor exceeds the amount repaid on pre-existing debt. *In re Arrow Air, Inc.*, 940 F.2d 1463, 1466 (11th Cir. 1991); *In re Erin Food Servs., Inc.*, 117 B.R. 21, 30-31 (Bankr. D. Mass. 1990).

### Acquiescence

41.     The Committee's equitable subordination and breach of fiduciary duty Counts are causes of action sounding in equity. In addition to holding that the Committee has failed to prove its case-in-chief on these Counts, I conclude that the Committee's claims are barred by the equitable defense of acquiescence, as applied by the Delaware courts.

42.     It has long been the law of Delaware that where a transaction cannot be accomplished without stockholder approval, a stockholder who either votes in favor of the transaction or accepts the consideration offered by the transaction is barred from asserting claims in claims in connection with that transaction. *See, e.g., Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 176-77 (Del. 1991); *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 848 (Del. 1987); *Elster v. American Airlines*, 100 A.2d 219, 220-221 (Del. Ch. 1953); *Finch v. Warrior Cement Corp.*, 141 A. 54, 60 (Del. Ch. 1928). Here, 95% of the noteholders, including *a majority of the members of the Committee*, did both: they voted in favor of Tranche C and accepted $675,000 in exchange for their consent. Thus, they have acquiesced to the Tranche C Loans. Having acquiesced to it, they cannot now be heard to argue that Tranche C should be treated as equity, nor that entering into Tranche C was a breach of fiduciary duty.

43.     While the Committee is a separate legal entity from the noteholders who approved Tranche C, the Delaware cases draw no such distinction. They typically arise

in a class action context, where like the seven members of the Committee, a stockholder attempts to bring claims not only on his or her own behalf, but on behalf of <u>all</u> stockholders, including stockholders that did not acquiesce. Nevertheless, the Delaware courts have barred the stockholders who acquiesced form asserting such claims on behalf of those who did not. *See, e.g., Kahn*, 591 A.2d at 176-77; *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727, 738 (Del. Ch. 1999), *aff'd*, 757 A.2d 1278 (Del. 2000) (TABLE) (noting, because a "large majority of the putative plaintiff class…both voted in favor of the merger and received the benefits of it," that "plaintiffs would confront substantial obstacles in continuing the action on behalf of those persons"). I find that the noteholders who control the Committee are in the same position and cannot maintain their equitable subordination and breach of fiduciary duty claims.

## Damages

44.     Even if I were to hold that the Committee had prevailed on one or more of its claims for breach of fiduciary duty, I would hold that it has failed to prove a recognizable measure and amount of damages. First, while Mr. Darr denied it, his damages calculation essentially is a deepening insolvency model, as it calculates the difference between the value that the unsecured creditors would have received if the Debtors filed for bankruptcy in October 2005 and the value available to them in this bankruptcy case.[3]     (Tr. 692-93).     The Third Circuit recently held that deepening insolvency is not a recognized form of damages. *Seitz v. Detweiler, Hershey & Assocs.*

---

[3] Mr. Darr's attempts to distinguish his model from deepening insolvency were unavailing. The fact that his model does *not* assume that the Defendants committed any wrong, Tr. 692-94, makes me <u>less</u> likely to apply the damages formulation, as that is a concession that there is no causation between the harm and the damages alleged. *See, e.g., Gannett Co., Inc. v. Kanaga, M.D.*, 750 A.2d 1174, 1188 (Del. 2000) ("Once liability is established, a plaintiff seeking recovery of damages in a tort action must establish causation and consequential damage."). Mr. Darr's other attempt to distinguish deepening insolvency, on the ground that he does not include new *unsecured* debt, Tr. 692-93, simply is irrelevant, since he is showing deterioration in value *above* the unsecured creditor level.

41

(*In re CitX Corp.*), 448 F.3d 672 (3d Cir. 2006). *Cf.* COL 16-18. Because I find Mr.
Darr's methodology to be indistinguishable from deepening insolvency and I find
deepening insolvency to be an impermissible measure of damages, I find no basis in the
record from which to compute damages.

45.     Moreover, Mr. Darr's damages calculation is overstated. First, more than
half of his computed damages assume that the Committee *loses* its subordination and
recharacterization arguments. (Tr. 694-96). Second, he readily conceded that he did not
subtract transaction costs from his analysis, but it is indisputable that to realize any value
at October 27, 2005, Radnor would have had to file for bankruptcy or undertake an
extraordinary corporate transaction, both of which are expensive. (Tr. 706-08). Third,
Mr. Darr's damages model incorrectly assumes that Radnor's value as of October 27,
2005 would not have been further reduced by Radnor's poor operating performance even
if it had been restructured in a bankruptcy on that date, an illogical assumption given the
Company's financial performance after October 27.

46.     Finally, I note that Mr. Darr opined that he had no opinion as to who
caused the damages or any inequitable conduct engaged in connection therewith (Tr.
694:4-9) and the theories offered by the Committee are rejected as discussed above.

Dated: Nov., 16, 2006
Wilmington, Delaware

HONORABLE PETER J. WALSH,
UNITED STATES BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| RADNOR HOLDINGS ) | Case No. 06-10894 PJW |
| CORPORATION, *et al.*, ) | |
| ) | Jointly Administered |
| Debtors. ) | |
| _____ ) | |
| ) | |
| THE OFFICIAL COMMITTEE OF ) | |
| UNSECURED CREDITORS OF ) | |
| RADNOR HOLDINGS ) | |
| CORPORATION, *et al.*, ) | Adversary Proceeding No. 06-50909 |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| TENNENBAUM CAPITAL ) | |
| PARTNERS, LLC; SPECIAL ) | |
| VALUE EXPANSION FUND, LLC; ) | |
| SPECIAL VALUE OPPORTUNITIES ) | |
| FUND, LLC; AND JOSÉ E. ) | |
| FELICIANO, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

# AMENDED
# FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On August 21, 2006 (the "Petition Date"), Radnor Holding Corp. and its affiliated

chapter 11 debtors ("Debtors" or "Radnor") commenced the above-captioned chapter 11

cases.    On September 22, 2006, the Court entered its "Final Order (I) Authorizing

Debtors (A) to Obtain Postpetition Financing . . ." (the "DIP Financing Order").    Also on

Sept. 22, 2006, the Court entered its "Order . . . (I) Establishing Bid Procedures Relating

---

[1] This amendment reflects (a) non-substantive changes and (b) fact finding
additions to Doc. # 37.  The judgment remains the same.

to Sale of Debtors' Assets . . ." (the "Bid Procedures Order"). On October 30, 2006, the Court entered its "Order Granting Official Committee . . . Standing" (the "Standing Order").

Pursuant to the DIP Financing Order and the Standing Order, the Court authorized the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee") to file a Complaint against Tennenbaum Capital Partners, LLC, Special Value Opportunities Fund, LLC, Special Value Expansion Fund, LLC (collectively, "Tennenbaum" or "TCP"), and José E. Feliciano (collectively with TCP, "Defendants"). Pursuant to the Bid Procedures Order (at ¶ 8), the Court ordered that the trial on the merits of the Complaint would include a determination on the allowance of the $128.8 million proof of claim filed by the Defendants. Also pursuant to the Bid Procedures Order (at ¶ 9), the Court ordered that the Defendants would be authorized to credit bid any allowed claim that survived adjudication of the Complaint.

On October 31, 20006, Plaintiffs filed the Complaint. By the time that trial commenced, the parties had engaged in nearly two months of extensive pre-trial discovery. The Court conducted eight full days of trial between November 2 and November 14, 2006, heard testimony from fourteen witnesses and admitted more than 350 documents into evidence. Based upon evidence presented at trial, the Court hereby makes the following Findings of Facts and Conclusions of Law. Based upon these Findings of Fact and Conclusions of Law, and in accordance with the requirements of Federal Rule of Bankruptcy Procedure 9021, the Court has separately entered judgment in favor of Defendants on all counts, allowing Defendants' claim in the amount of $128,835,557.26, and authorizing the holder of such allowed claim to credit bid the allowed claim at any

2

sale of property of the Debtors that is subject to a lien securing such allowed claim.

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

The Court has jurisdiction to hear and determine the causes of action and requests for relief contained in the Complaint pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of the adversary proceeding in this district is proper under 28 U.S.C. §§ 1408 and 1409. Defendants have consented to the entry of final orders and judgments by this Court on all non-core proceedings pursuant to Fed. R. Bankr. Proc. 7012(b).

## FINDINGS OF FACT

1.      In the late summer of 2005, Tennenbaum partner Jose Feliciano learned from his partner Steven Chang that Radnor was looking for financing through its placement agent, Lehman Brothers. (Tr. 17:9-15; 18:3-6).

2.      Lehman Brothers advised Radnor that a transaction to raise a combination of debt and equity capital was in Radnor's best interests. Radnor was seeking approximately $50 million in new debt and equity capital ($30 million of senior secured debt plus $20 million of convertible preferred stock) to fund an expansion of its growing polypropylene cup business and related working capital. (Tr. 351:3-7; 736:1-4; 876:14-24; 877:1-22; 950:3-12; 953:1-23). Radnor also contemplated a later IPO. According to Michael Kennedy, Radnor's CEO and majority shareholder, in a June 2005 e-mail to a Radnor board member and Radnor's in-house counsel, "we plan to follow this capital

3

raise with the IPO, but if delayed to 2006 for any reason we should have plenty of liquidity." (JX 23). TCP was fully aware of Radnor's IPO intent prior to its first transaction in October, 2005. (JX 40). The Lehman plan to have an infusion of $30 million of debt and $20 million of equity contemplated that the $30 million of debt would be secured by collateral which was already the subject to a lien by a $70 million lender. The $30 million new senior secured debt would be secured pari passu with the existing $70 million obligation. However, Radnor would have to obtain the consent of the $70 million lender for the sharing of such collateral.

3.      Lehman Brothers canvassed the market through a Private Placement Memorandum and contacted 40 potential investors. (Tr. 17:9-24; 33:6-34:22; 232:19-233:22; 1165:15-1166:6; JX 311). Lehman determined that the best strategy was a part debt, part equity transaction. (Tr. 1211:2-24).

4.      Mr. Finigan, a member of the Board of Directors of Radnor, testified that management considered a range of options (Tr. 1175:1-22), and believed that liquidation would have provided less value than operating the Company. (Tr. 1176:2-15; *cf.* Tr. 707:6-22).

5.      TCP was chosen among the 40 entities solicited by Lehman because it was willing to move the most quickly. (Tr. 1756:19-1757:5).

6.      The Company's projections showed that it expected to earn $48 million in EBITDA in 2005 and $81 million in EBITDA in 2006. (Tr. 21:24-22:3; 23:20-23; JX 311).   Mr. Feliciano believed that an investment in Radnor was worth further consideration due in part to its potential for sustained growth. (Tr. 200:17-20).

4

7.      Throughout the late summer and early fall of 2005, TCP engaged in extensive financial, business and legal due diligence. (Tr. 320:7-23; 523:12-524:20; 834-35; 838:16-839:8; 842:22-843:11; 987:8-988:17).   Among other things, it met with Radnor personnel, customers and suppliers to gain a better understanding of the nature of Radnor's businesses and visited Radnor's operating facilities.   TCP also assessed the Company's historical performance to help evaluate whether the Company's optimistic forecasts were justified.   In mid-September 2005, TCP retained FTI Consulting, Inc. ("FTI") to perform accounting due diligence of Radnor's historical financial data.   (Tr. 990:11-19; 991:2-10; 1088:6-1090:16; JX 58).   FTI submitted to TCP its Financial and Accounting Due Diligence Report on October 10, 2005.   (JX 58).

8.      Tennenbaum had no reason to doubt the financial information that was provided by Radnor management.   (Tr. 1092:11-24).   Indeed, while the FTI report disagreed with certain accounting adjustments made by Radnor, the types of accounting adjustments reflected in the FTI report were not in any way unusual or extraordinary. (Tr. 1091:6-13; 1091:23-1092:10).

9.      Radnor exceeded forecasts in 2001 and met forecasts in 2002.   As of October 27, 2005, the only full years it had missed forecasts were 2003 and 2004, the very year the company acquired Polar Plastics, a new line of business for the company, and the next year.   Moreover, the Court credits the testimony of Mr. Palm of Lehman Brothers that as of October 2005, the Company's projections were well thought out "bottoms up" projections and that each assumption was supportable, even if in the aggregate the projections were optimistic.   (Tr. 1748:9-1749:1).

10.      In early October 2005, Mr. Feliciano and his colleagues provided to the

TCP's Investment Committee a detailed update on TCP's due diligence efforts and gave the Investment Committee the opportunity to consider both the benefits and the risks of making an investment in Radnor. (Tr. 60:21-61:7; 197:18-24; JX 55). Mr. Feliciano also presented to the Investment Committee TCP's internal projections for 2006 EBITDA. Although Mr. Feliciano was hopeful that Radnor would reach its projection of $81 million in 2006 EBITDA, he prepared conservative internal projections that considered a "downside" scenario (of $61 million EBITDA) should the Company not perform as expected. (Tr. 61:12-18; 198:4-21).    The preparation of conservative downside projections is customary for TCP and for many other investment firms. It does not indicate that TCP expected EBITDA to be at that level. (Tr. 55:22-56:15).

11.    On October 27, 2005, TCP made its initial investment in Radnor through a commitment to purchase $25 million of Series A Preferred Stock (the "Preferred Stock") and to lend $95 million in senior secured debt to the Company (the "Tranche A and Tranche B Loans") (Tr. 234:14-235:4). The Tranche A and Tranche B Loans closed on December 1, 2005. (JX 91, 93). They were funded at 99.25% of par. (Tr. 92:22-93:2). The Preferred Stock included detachable warrants that would give TCP the right to own certain levels of Radnor common stock (not to exceed 15.625%), depending on the Company's actual EBITDA performance. (Tr. 496:1-24).

12.    As noted above, Radnor believed that it would be able to obtain consents from its existing senior secured noteholders in connection with the new $30 million secured obligation. That turned out to be wrong. Thus, Radnor used the $95 million Tranche A and B loans proceeds to redeem all of the $70 million of senior secured notes. (Tr. 83:17-85:17). In addition, the TCP loan proceeds were used to pay down $4.7

million of equipment loans, pay down Radnor's revolving credit facility and fund working capital and growth initiatives. (Tr. 5-26; 67:1-21; 269:4-21; 397:7-398:15; 402:5-16; JX 91).

13.    On October 27, 2005, TCP entered into an Investor Rights Agreement with Radnor's shareholders. (JX 78). The Investor Rights Agreement gave TCP several rights that are often given by an issuer to protect the interests of minority shareholders including the right to designate one member and one observer to the board, the right to increase its representation on the board if the Debtors failed to achieve certain EBITDA levels, and the right to veto certain employment agreements and transactions with affiliates. (*Id.*; Tr. 502:5-9; 1356:23-1358:16). TCP never exercised any of those rights (Tr. 502:5-9, 502:23-503:9) other than the right to designate one member and one observer to Radnor's Board of Directors. (JX 78 §§ 3.1, 3.2.). Mr. Kennedy retained the right to appoint the remaining three directors. TCP designated Mr. Feliciano and Mr. Mehrotra as the representative Board member and observer, respectively. (Tr. 120:22-121:2). Mr. Feliciano testified that the provisions set forth in the Investor Rights Agreement are "fairly typical" for such an equity investment. (Tr. 205:17-206:19). My experience fully supports that view. The Investor Rights Agreement reflects a reasonable and appropriate mechanism for protection of a minority equity interest. The Committee offered no expert testimony on practices relating to lender or investor protection provisions.

14.    Mr. Feliciano testified that TCP did not plan to acquire the Debtors at the time that TCP made the initial investment in the Debtors, nor at any time thereafter. (Tr. 47:16-22). There is no reliable evidence to the contrary. None of the internal

memoranda prepared by TCP when the first investment was made show that TCP had any intention of buying Radnor. (Tr. 243:23-244:22; JX 40, 66). The TCP memoranda prepared when the initial investment was made showed that TCP believed that even the liquidation preference of the Preferred Stock would be paid in a downside scenario, and that Radnor would comply with the $55m EBITDA covenant for 2006. (JX 55). The belief that the company could meet its EBITDA targets was shared by those on the Radnor board. (Tr. 1748:9-1749:1).

15.     TCP received representations from the Company that it was solvent, including a solvency certificate from the CEO and CFO (Mr. Ridder) of Radnor at the time of the Tranche A and B loans. (Tr. 112:2-23; JX 91 at p. 14 § (ii), p. 55 § (l)). I find that it would be irrational to believe that TCP would have made a $25 million equity investment if it believed Radnor were insolvent at the time. Tennenbaum's infusion of $25 million in the form of preferred stock (with warrants and conversion rights) is a clear indication that Tennenbaum believed that there was an upside to its investment. If, as the Committee argues, Tennenbaum's scheme was a "loan to own," why would it make an equity investment in addition to the debt transaction? The logical alternative would be to make a debt investment only so that Tennenbaum would have a better position in the event of a meltdown, i.e., a liquidation.

16.     TCP understood in October 2005 that the Company was seeking a capital infusion to fund new product initiatives that were already in place. The Company had already executed agreements regarding new products, like its polypropylene cup line, at the time. (Tr. 39:7-12; 316:3-21; JX 81; 351:3-7; 516:19-517:1; 876:14-878:13; 949:14-954:9; 1048:16-1049:2; JX 58).

8

17.    The Radnor board of directors believed that the capital infusion sought in June 2005, and occurring in October 2005, was in the best interests of the Company and would be favorable to its capital structure (Tr. 397:21-398:15; 936:16-937:12; 1163:12-1164:17; 1169:13-24). The Board similarly believed that the Tranche A and Tranche B transactions were in the best interests of the Company by providing liquidity to fund new business initiatives and paying down existing debt. (Tr. 1167:10-1169:24).

18.    At all times, Radnor and Tennenbaum treated the Tranche A and B loans as debt investments. (Tr. 239:11-240:10, 577:3-578:11). All internal memoranda from TCP show that the Tranche A and B loans were referred to as debt. (JX 40, 66). The documents themselves contain typical terms and conditions of a secured debt instrument: the Tranche A and B loans provide fixed maturity dates; fixed interest payments; default provisions and common maintenance and incurrence covenants. (JX 91, p. 19, 20, 50; JX 171, § 1.9).

19.    All internal memoranda from TCP both at the time of the Tranche A and B transactions and thereafter demonstrate that TCP's estimate of the "downside" scenario show that the debt and the liquidation preference of the preferred stock investment would be paid by the enterprise value of the Company. (JX 55; Tr. 60:20-64:5).

20.    The collateral package for the loans under Tranche A and B included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12; JX 54; 71 Annex 1). Tennenbaum undertook a reasonable process to ascertain the value of its collateral package for the Tranche A and B loans. (Tr. 321:9-322:16; 834:4-835:4). Radnor provided Tennenbaum with appraisals that indicated the collateral available as security for the loans was equal to or greater in value than the

outstanding amounts of the Tranche A and B loans at the times they were issued. (Tr. 227:12-228:12; 1683:7-10; JX 54, 242).

21.    Radnor's capitalization in October 2005 was not clearly insufficient to support a business the size and nature of Radnor's in light of the circumstances at the time the Tennenbaum loans were made. (Tr. 39:4-40:20, 898:9-899:2). At the time of the Tranche A and B loans, Radnor may have been able to borrow a similar amount from another lender, based on the number of interested investors identified by Lehman. (Tr. 33:6-23, 1165:15-1166:6).    Mr. Kennedy testified that in Lehman's efforts in August/September 2005 it had contacted numerous potential investors and between 20 and 25 such potential investors signed confidentiality agreements to obtain more information from Radnor. (Tr. 355:23-356:10). This fact certainly suggests that there were a number of potential investors who, after reviewing the Lehman's August 2005 memorandum, did not believe it was not worth considering the proposed debt and equity investment.

22.    The Debtors' creditors were not harmed by the Tranche A and B loans and preferred stock investment, but rather benefited from them. The Tranche A and B loans and preferred stock investment by TCP, in the aggregate, decreased Radnor's net debt. (Tr. 104:15-105:5; 241; 534; 939-40; 1674:3-1675:9).

23.    In early 2006, TCP received preliminary indications from Radnor management that the fourth quarter 2005 earnings would be below expectations. (Tr. 512:23-513:11). Mr. Feliciano received the Debtors' actual fourth quarter and year-end results at a Radnor Board meeting held on February 9, 2006. (Tr. 123:10-124:1; JX 117). The numbers were dismal, and defied even the most conservative EBITDA estimates that

10

had been given to TCP by the Debtors in January: $20 million of negative EBITDA in 2005, in contrast to the projection of $48 million of EBITDA that Radnor had used to induce the TCP Lenders to make their investment in Radnor. (Tr. 594:3-9; 23:15-23).

24.    Upon receiving Radnor's fourth quarter results, TCP performed further investigations over the following weeks to get a better understanding of the reasons behind the losses and the nature and extent of the issues facing the Debtors in 2006. (Tr. 1062:13-21; 1065:16-1066:20; JX 133). The Debtors' bank lenders took similar steps, engaging Brandlin & Associates, a forensic accounting firm, to monitor the Debtors. (Tr. 560:3-24; 501:1-4). As part of its investigations, and to better monitor the Debtors' performance, TCP requested that management provide TCP with more detailed and timely financial information. (Tr. 127:16-128:20). In addition to meetings with Radnor personnel, TCP requested that the Company provide it with Daily Performance Reports and borrowing base certificates on a regular basis. (Tr. 127:23-128:10; 132:23-133:4). As part of TCP's investigation in the first quarter of 2006, a group of TCP representatives traveled to Radnor, Pennsylvania in March. (Tr. 1061:20-1062:21; 1081:12-24; 1256:10-20). During this same period, in the interest of protecting the bank lenders, Brandlin & Associates was reviewing Radnor's forecasts (inside information). (JX 223).

25.    Mr. Feliciano provided updates to the Investment Committee on or about February 9, 2006, February 14, 2006 and March 10, 2006, summarizing the team's efforts as they gathered more information about the Debtors' performance. (JX 117, 125, 133). Mr. Feliciano reported that the Debtors blamed the downturn in the fourth quarter on several factors, including higher than expected raw material costs, delays in expected price increases, and a more severe negative impact from the Gulf Coast hurricanes than

11

the Debtors or TCP had ever expected. (JX 133 at 1). Mr. Feliciano remained cautiously optimistic about the Debtors' business prospects based on the anticipated roll-out of new products and advised the Investment Committee that he would continue to refine expectations for the Debtors' 2006 earnings. (JX 133 at 9).

26.    As a result of the devastating decline in earnings in the fourth quarter of 2005 and the first quarter of 2006, the Debtors faced cash flow and liquidity problems and requested an additional advance from TCP to bridge the liquidity gap. (Tr. 529:9-530:20). Given the amount of capital TCP had invested in the Debtors, Mr. Feliciano and TCP were understandably concerned about the Debtors' liquidity issues and performed more diligence, with the assistance of TCP's Mr. Mehrotra and Mr. Berry, to evaluate the Debtors' needs and to update the Investment Committee. (Tr. 1062:13-21; 1065:16-1066:10; JX 133).

27.    The unsecured noteholders received a $7.4 million interest payment on March 15, 2006. (Tr. 555:24-556:22).

28.    In a memo to the Investment Committee dated March 28, 2006, Mr. Feliciano and his colleagues reported the results of their investigation, including the Company's plans to stabilize the business, take advantage of the opportunities presented by its new products, and improve performance. (JX 155).

29.    The Company had provided TCP with new projections showing that an additional advance would be sufficient to fund their operations and that, under its revised business plan, the Company expected to earn $60 million in EBITDA in 2006. ((JX 155 at 1). On this basis, Radnor requested that TCP provide an additional $23.5 million to fund what Radnor described as short term liquidity needs. (JX 155 at 8-9).

30. On April 4, 2006, TCP agreed to make an additional advance (the "Tranche C Loans") in the amount of $23.5 million. (Tr. 426:12-15; 435:23-24; 435:23-436:3; 554:8-10). The documentation for the Tranche C Loans included (a) an amendment to the Tranche A and Tranche B credit agreement; (b) an amendment to the Tranche A security agreement; and (c) two floating rate secured notes with a fixed maturity date of September 19, 2009. (JX 171, 172). In all material respects, the Tranche C loans had the same terms and conditions as the Tranche A and B Loans, except that the Tranche C Loans could be prepaid without penalty and were subject to an increase in their interest rate if not repaid within one year. (JX 176). The collateral package for the Tranche C Loans included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12).

31. Radnor had requested that TCP make an additional equity investment in Radnor instead of making the Tranche C Loans but TCP was consistently clear that it would only make an additional debt investment. (Tr. 416:1-417:15). From Tennenbaum's perspective an additional equity investment made no sense. It was facing the prospect of losing its October 27, 2005 Preferred Stock investment. Why would it put in more equity money? The answer is obvious.

32. At the time of the Tranche C Loans, Radnor represented that it was solvent. (Tr. 551:17-552:24; 553:1-18; 1366:15-1367:8; JX 179). Messrs. Kennedy and Ridder provided a solvency certificate to TCP on April 4, 2006, representing that Radnor was solvent, taking into consideration both the capital infusion and debt service represented under the Tranche C Loan. (Tr. 112:20-23; 552:3-553:1; 555:23-556:22; 1366-67; JX 139). In connection with preparing the solvency certificate, Mr. Ridder

13

consulted with inside and outside counsel, Messrs. Kennedy and Hastings and PriceWaterhouseCoopers. (Tr. 1366:18-1367:2).

33.    Tennenbaum had no reason to doubt the financial information that was provided by Radnor management or the solvency certificates. (Tr. 1092:11-21). All internal memoranda from TCP when the Tranche C Loan was made show that TCP's estimate was that the Company was still solvent. (JX 133, 152, 155).

34.    The Radnor board believed that the Tranche C Loan was in the best interest of the Company and was needed to address a short-term liquidity need. (Tr. 936:16-937:12; 1182:1-21). Mr. Kennedy at all times acted in the best interests of the Company and made decisions that he believed would benefit both Radnor and its shareholders. (Tr. 527:3-17; 528:3-529:22; JX 128).

35.    Mr. Feliciano abstained from voting on the Tranche C transaction. (Tr. 185:14-18; 229:8-21; 1200:17-22; 1678:9-14; JX 165).

36.    The Debtors' creditors were not harmed by the Tranche C loan, but rather benefited from it. (Tr. 936:16; 937:12; 939:9-940:7; 1163:12-23; 1169:1-24). The proceeds from Tranche C were used partly to the benefit of Radnor's unsecured noteholders. Tranche C proceeds were also used to pay down trade debt, but were mostly used for working capital purposes, which assisted the Company's efforts to turn the corner for the benefit of, *inter alia*, unsecured creditors. (Tr. 154:6-24). The noteholders also benefited from the Tranche C loan in the money they received from their consents, described below.

37.    TCP converted $3.2 million of interest due on the Tranche A and B Loans into Tranche C loans, but never received cash from the Company. (Tr. 154:20-24).

14

38.    TCP never declared a default based on the failure of the Company to meet the $55 million EBITDA covenant in the Credit Agreement. The earliest date that TCP could have declared a payment default acceleration would have been August 17, 2006. (Tr. 1693:7-1694:8). TCP never declared a default based on the alleged breach of the representation of solvency.

39.    In connection with the Tranche C Loans, the TCP Lenders requested that Mr. Kennedy make a personal financial contribution to the Company to demonstrate Mr. Kennedy's commitment to returning the Company to profitability. (Tr. 430:10-24). Mr. Kennedy also (i) agreed not to receive bonus compensation for calendar 2006; (ii) made a $1 million preferred stock investment in the Company; and (iii) personally guaranteed $10 million of the Tranche C Loans. (Tr. 547:1-6; 547:24-548:6). It would be irrational to believe that  Mr. Kennedy would have done this if he believed that Radnor was insolvent or was headed for a bankruptcy filing.

40.    TCP and the Radnor shareholders entered into a letter agreement dated April 4, 2006 ("Side Letter") under which the Radnor shareholders agreed that they would cause Radnor to appoint a Chief Operating Officer on or before September 30, 2006. (JX 173, Side Ltr. Pg. 2 ¶ 4; Tr. 557:14-17). TCP, at Radnor's request, gave up its right under the Side Letter to appoint a Chief Operating Officer of its choosing by agreeing in writing that the appointment of Stanford Springel satisfied the Side Letter. (Tr. 166:3-14). Mr. Springel's hiring was due in part to a demand from representatives of the Company's bank group that Radnor hire more senior executives -- not at the insistence of Mr. Feliciano or TCP. (Tr. 1190:13-1191:14). Mr. Springel is a managing director with the turnaround management firm of Alvarez and Marsal. He has 17 years

15

experience in the turnaround management business. (Tr. 1438:18-24).

41.    The Side Letter also contains a covenant giving TCP the right to appoint a majority of Radnor's board following a payment default and subsequent acceleration of the TCP Loans. (JX 173; Tr. 558:3-24; 559:4-6). Given the trigger date of the payment default, TCP could not exercise this right earlier than August 17, 2006, and never exercised this right. (*Id.*; Tr. 459:4-9; 1691:16-1692:16; 1693:22-1694:8).

42.    In 2004 Radnor issued unsecured notes in the face amount of $130 million. The unsecured noteholders had the right to stop the Tranche C loan from being made because the additional secured loans would have exceeded the maximum "indebtedness" permitted under the unsecured noteholders' Indenture. Radnor therefore solicited the consent of the noteholders to modify the Indenture. On or about April 3, 2004, 95% of the noteholders executed written consents to amend the Indenture, explicitly agreeing to an increase of secured indebtedness in the amount of $25 million. (Tr. 236:8-237:5;426:2-5; 435:23-436:3; JX 167).    The price for the consent was $1,350,000. Radnor paid the first half of that fee, $675,000, upon execution of the consents. (Tr. 235:22-238:15; 533:2-541:22; 937:13-939:8; 1177:13-1178:2; Ex. 167). The consent of the unsecured noteholders is, in my view, clear evidence of the acknowledgment that the Company had serious liquidity problem and that the Tranche C secured debt transaction had the prospects of a solution to that problem. The Committee consists of seven unsecured creditors, four of whom are large holders of the unsecured notes. (Tr. 1670-71).

43.    The consents that the unsecured noteholders signed acknowledged that Tranche C was a debt investment, referring to the need for additional "indebtedness."

(Tr. 533:2-541:22; JX 167).

44.     Article Seven of Radnor's Certificate of Incorporation provides that Radnor's directors cannot be liable for a breach of the duty of care. (JX 350).

45.     Mr. Feliciano was a valuable member of the Radnor board and consistently acted in the best interest of Radnor. (JX 127; 1173:2-9). His conduct was confirmed by all other members of the Radnor board, who testified that he was a productive and valuable member of the board who made helpful suggestions and was interested in the welfare of Radnor. (Tr. 524:1-20; 527:3-17; 573:8-21; 577:7-15; 943:2-944:21; 1171:14-1173:9; 1187:8-24).

46.     TCP appointed one board member out of a total of four, and did not control the Debtors' affairs. (Tr. 519:8-10; 576:13-577:15; 847:3-11). Neither TCP nor Mr. Feliciano ever controlled Radnor's operations. (Tr. 167:18-168:9; 171:3-173:13; 205:17-206:24; 241:2-242:11; 576:13-577:15; 602:12-604:8; 847:3-11). Mr. Kennedy, as majority shareholder and CEO, controlled Radnor at all times. (Tr. 43:13-44:20, 167:18-168:9, 171:3-173:13). TCP's board of directors seat flowed from its preferred equity investment. (Ex. 78, pg. 18 ¶ 3.1). For a minority shareholder to hold a seat on the board of directors is not uncommon. (Tr. 496:4-12' 929:14-930:23; 1171:14-1173:9). No one at TCP ever exercised control over the Radnor board of directors. (Tr. 231:4-22; 459:4-9; 558:3-559:9). The Committee makes much of the fact that the Radnor board minutes of May 17, 2006 (more than a month after the Tranche C transaction) show that in house counsel for Tennenbaum (Mr. Hollander) attended a board meeting (JX 214). On its face this suggests no impropriety by Tennenbaum or Radnor and the Committee has offered no explanation of any possible wrongdoing. Presumably, he was invited to

17

advise on the restructuring matters and it is clear that Radnor's board (controlled by insiders) was in need of all the help that it could get.

47.      There is only one financing transaction included in the Committee's complaint that occurred while Mr. Feliciano was a member of the Radnor board: the Tranche C loan. (Tr. 929). Mr. Feliciano abstained from voting on the Tranche C Loan. (Tr. 1200:8-22; JX 165).

48.      As of April 13, 2006, the Debtors were still providing guidance to their public investors that they expected to earn $45-50 million in EBITDA in 2006. (Tr. 598:10-599:2). Unfortunately, these projections proved to be wrong, and the Debtors fell short of their business plan. Within approximately three weeks of the Tranche C Loans, the banks under the Company's revolving credit facility determined that the borrowing base information provided to them had been inaccurate, and that their loans were overadvanced. (Tr. 441:18-442:10). The loss of liquidity caused by the recalculation by the banks of the borrowing base was exacerbated by continued failures by Radnor to meet its projections.

49.      During June 2006, Radnor's revolving lenders threatened to cut off funding under its working capital facility (Tr. 441:18-442:10), and did so in July 2006, which left the Company with no alternative but to file these bankruptcy cases. Thus, TCP transactions did not cause the bankruptcy cases.

50.      The Debtors requested that TCP provide a stalking horse bid on terms that would ensure the highest and best offer for the Debtors' assets. (Tr. 177:3-15; 576:2-12). The TCP Lenders were reluctant to do so, but were convinced by the Debtors that without such a bid, there would likely be a "free-fall" bankruptcy, resulting in a chapter 7 instead

of chapter 11 and attendant loss of value. (Tr. 1486:6-1487:4; 1736:11-14; 1738:15-1739:8). Thus, TCP reluctantly agreed to act as the stalking horse bidder, which led to negotiations on the Asset Purchase Agreement ("APA") dated August 21, 2006. (Tr. 177:3-178:17; JX 287).

51.    Mr. Feliciano had already resigned from the Radnor board when the APA was negotiated in July and August of 2006 and did not pressure Radnor's other directors to approve it. (JX 287; Tr. 176:5-8; 576:1-24; 599:1-24; 1683:7-10; JX 242). Radnor approached TCP, not the reverse. (Tr. 529:2-22; 574:1-7; 1476:4-11). Indeed, rather than Mr. Feliciano twisting the board's arm to engage in sweetheart deals with TCP, (a) TCP entered into a forbearance agreement in July 2006 for no fee when Radnor failed to make an interest payment (Tr. 1466:5-1467:14; JX 260); (b) agreed to subordinate a portion of its secured debt to the revolving lenders (also for no fee) (JX 259) and (c) the APA was only reached after what Mr. Springel, the independent COO and later independent CRO, characterized as "spirited and arms length negotiations." (Tr. 1478:4-22; 1487:2-23). The principle negotiators on behalf of Radnor were Mr. Springel, Radnor's in-house counsel (Miss Carrie Williamson) and Radnor's outside counsel (Skadden Arps Slate Meagher & Flom).

52.    The Radnor board believed that the APA was in the best interest of the Company and its constituents. (Tr. 941:22-942:15; 1515:20-1516:21). The Court previously ruled, in its bidding procedures order, that the decision to enter into the APA was "in the best interests of the Debtors, their estates, their creditors, and all other parties in interest." (Dkt. 144 at p. 2). The Court has previously ruled that the Committee has waived the right to object to the sale process. (Dkt. 144 at ¶ 1). At the bid procedure

hearing on September 22, 2006, Radnor's counsel proffered the testimony of Mr. Shapiro on behalf of Lehman Brothers and Mr. Springel as Radnor's CRO in support of the bid procedure order.  The Committee did not cross examine either witness or otherwise object to their testimony.  I specifically herein incorporate by reference the testimony offered by Mr. Shapiro (Doc. # 369 at pp. 43 through 45) and Mr. Springel (Doc. # 369 at pp. 47 through 52).    At the conclusion of the September 22, 2006 hearing the Committee's counsel  stated the Committee's "support" of the bidding procedures order. (Doc. # 369, p. 71).

53.    Radnor provided any party interested in bidding on the Debtors' assets in the bankruptcy cases with material non-public information if they agreed to sign a confidentiality agreement.  (Tr. 487:6-488:11).

54.    There is no evidence showing that TCP or Mr. Feliciano ever used insider information in an inappropriate manner.  Mr. Feliciano served on Radnor's Board of Directors from February 9, 2006 until June 26, 2006.  There is no evidence in the record showing that during this period TCP had access to "inside" information that was relevant to a purchase of Radnor's assets that was not also available to other potential purchasers in Radnor's data room – made available to potential purchasers who signed a confidentiality agreement.

55.    On August 22, 2006, TCP filed the Declaration of Jose Feliciano, to which was attached the Credit Agreement, guaranties, security agreements, and all lien and security interest filings, evidencing Tennenbaum's claims.  (Dkt. 27).  On September 12, 2006, TCP filed its proof of claim in the amount of $128,835,557.26 (as of the Petition Date), to which was attached the Feliciano Declaration and all exhibits, as well as a

detailed breakdown of components of the proof claim. (Dkt. 156). The proof of claim included copies of properly recorded mortgages, fixture filings and UCC financing statements. (Dkt. 156). The Committee did not submit any evidence contradicting the validity or enforceability of the liens and security interests securing such claim. The proof of claim is secured by all collateral described therein.

56.    The only evidence before the Court shows that the collateral securing the Tennenbaum claim was valued at more than $132.2 million (JX 54; 71, Annex 1), more than Tennenbaum's $128.8 million petition date claim.

57.    The Committee's Complaint challenges as a preference an interest payment made on April 4, 2006. This payment is outside the 90-day preference period. Thus, the Committee asserts that Tennenbaum was an insider. I find that Tennenbaum was not an officer, director, or partner of the Debtors, nor a relative of any of them, and Tennenbaum also never held 20% of the voting securities of the Debtors. At the time of the making of the interest payment on April 4, 2006, Tennenbaum held no voting securities of the Debtors.

58.    Tennenbaum was not a "person in control of the Debtor." Mr. Kennedy, not Tennenbaum, was in control of the Debtors. *See* FOF 46.

59.    Tennenbaum delivered $23.5 million as an additional Tranche C advance under the Credit Agreement, of which $3.2 million was credited as a payment of interest on the pre-existing Tranche A and B debt. Therefore, the net effect was new value in excess of $20 million. Thus, the Debtors' estates were enhanced by this infusion of new value. Tennenbaum was never repaid this $20 million.

60.    Both the Debtors and Tennenbaum intended that the $3.2 million interest

payment be part of a contemporaneous exchange. Two documents executed by the Debtors and Tennenbaum clearly evidence that intent. On March 15, 2006, the Debtors and Tennenbaum agreed in writing that the $3.2 million interest payment due that day would be paid in connection with the funding of the Tranche C loan several weeks later. (Tr. 554:8-15; 556:11-22; 842:4-10; 1673:17-23; JX 139; JX 171 § 1.4). The final documentation of the Tranche C loan, Amendment No. 1 to the Credit Agreement, expressly provided that net proceeds of the Tranche C loan would be used to make the interest payment on the Tranche A and B loans due on March 15, 2006. (Tr. 441:14-17; 554:8-15; JX 171 § 1.4). Thus, the parties intended that the interest payment and the new value delivered by Tennenbaum would be contemporaneous exchanges.

61.     The transfer of the interest payment by the Debtors and the delivery of new value to the Debtors, were contemporaneous. They occurred electronically at the exact same moment. On April 4, 2006, Tennenbaum actually delivered to the Debtors an amount equal to only the Tranche C loan of $23.5 million *minus* the $3.2 million interest payment which Tennenbaum credited as payment of the Tranche A & B interest payment.

62.     The Committee makes much of the "thank you" e-mail sent by Mr. Ridder to Mr. Feliciano (JX 275). This is the only evidence that the Committee presented to suggest a sub rosa arrangement between Radnor (or any employee of Radnor) and Tennenbaum leading up to the Asset Purchase Agreement.     However, Mr. Ridder explained in detail at the trial and in his prior deposition that this comment was made in the context of Mr. Feliciano's comment during a conference call that Radnor's financial group would be treated fairly in a transition.   (Tr. 1307:17-1308:17).  This does not support a conclusion that there were any improper dealings between Mr. Ridder and

Tennenbaum leading up to the Asset Purchase Agreement. Mr. Springel confirmed that these "assurances" were nothing more than a reference to the transition arrangement and severance payments. (Tr. 1451:18-1452:6; 1452:18-1453:3). Mr. Springel was involved in the conference call and testified that nothing improper occurred. (*Id.*; Tr. 1455:70-1456:20). As to whether there were any promises of employment, Mr. Springel emphatically said "absolutely not." (Tr. 1457:3-5).

63.    On June 14, 2006 Lehman was retained to assist Radnor in assessing various alternatives for solving the liquidity crisis. (Tr. 1470:2-1470:3). With that input, Mr. Springel concluded that a sale transaction was the most doable of the alternatives. (Tr. 1470:24-1471:3).

64.    The Committee implies an impropriety in Radnor's retention of Lehman Brothers in June 2006 because of Lehman's prior dealings with Tennenbaum. Lehman's long term relationship with Radnor made it a logical choice for Mr. Kennedy to pick as a financial advisor at the time of the financial crisis in the Spring of 2006. Furthermore, given Lehman's role in the August 2005 search for capital, and therefore its knowledge of the Company, this would seem like a logical selection by Radnor in June 2006. Mr. Feliciano understandably could have also believed that Lehman would be a logical choice for the engagement. It would follow that he saw no reason to inform Mr. Kennedy of Lehman's prior dealings with Tennenbaum on totally unrelated matters, assuming he was aware of them at the time. With respect to the late disclosure by Lehman of its prior relationship with Tennenbaum, Mr. Shapiro (Lehman's manager leading the engagement) testified that even if he had been aware of it at the time of his application for retention, he would have still sought the engagement. In my view, he rightly could have.

65.    Mr. Springel testified that the sale process was "full and fair" and no favorable treatment was given to Tennenbaum in the sale process. (Tr. 1543:4-11). The Committee focuses on the transition schedules developed by Mr. Ridder and sent to Tennenbaum but not put into the data room as evidence of an unlevel playing field. Mr. Springel testified that this transition schedule was not an important matter and that other bidders could do their own administrative cost analysis based upon data available in the data room. (Tr. 1523:19-1524:19).

## CONCLUSIONS OF LAW

### Recharacterization

1.    The Court rules against Plaintiff and in favor of Defendants on Counts I and II of the Complaint and concludes that the Tranche A, Tranche B and Tranche C Loans are true debt instruments and should not be recharacterized as equity. Taking into account the terms of the documents themselves, the facts and circumstances surrounding the making of the loans, the reasonable inferences to be drawn therefrom, as well as the economic reality of the circumstances, the Court concludes that, at the time of the transactions, the parties intended that the transactions were debt transactions and not equity.

2.    In *Cohen v. KB Mezzanine Fund II, (In re SubMicron Systems Corp.)*, 432 F.3d 448 (3d. Cir. 2006), the Third Circuit explicitly rejected a "mechanistic" approach to the analysis of a recharacterization claim, under which the court weighs certain factors. Rather, the Court held that the overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by a applying any

24

specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction:

> [C]ourts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.    That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

*Id.* at 455-456.

3.      The comprehensive analysis of "intent" adopted by the Third Circuit in *SubMicron,* leads this Court to conclude that Radnor and TCP intended that the Tranche A, Tranche B and Tranche C Loans were true debt investments. Considering the facts and circumstances surrounding the TCP Loans, as well as the reasonable and logical inferences drawn therefrom, the Court finds that the Tranche A, B and C loans were intended to be and were true debt and not equity. No evidence contradicts this intent. *See* FOF 18, 31.

4.      Even were the Court to divine the parties' intent by applying the variety of factors considered by other courts in recharacterization cases, the Court's decision not to recharacterize the TCP Loans would be the same. The Court finds that the TCP Loans (a) are referred to as "debt" and/or "indebtedness" in the transaction documents; (b) were consistently referred to by all parties as "loans" and/or "indebtedness"; (c) contained a fixed maturity date of September 15, 2009; (d) gave TCP the right to enforce the payment of principal and interest; (e) contain no "voting rights"; (f) were treated as priority debt instruments, the proceeds of which were used for working capital and to replace and/or

25

pay down existing debt; and (g) are secured interests given priority in a liquidation or insolvency. *See* FOF 18, 20. *See also SubMicron*, 432 F.3d at 456 n.8.

      5.     TCP's knowledge that the Debtors were experiencing a liquidity crisis when the Tranche C Loans were made, *see* FOF 26-28, is insufficient to support recharacterization. The *SubMicron* Court expressly considered this issue and rejected recharacterization because it found that it was legitimate for an existing lender to extend additional credit to a distressed borrower as a means to protect its existing loans. *See SubMicron*, 432 F.3d at 457 ("[W]hen existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."); *Bayer Corp. v. Mascotech, Inc. (In re AutoStyle Plastics)*, 269 F.3d 726, 748 (6th Cir. 2001). Thus, the Court is not persuaded by the Committee's allegation in its complaint that "no prudent lender" would have made the TCP Loans.

      6.     Although not determinative of the issue of recharacterization, the Court further concludes that TCP did not exercise control over Radnor's day-to-day operations. *See* FOF 46. Mr. Feliciano's designation as a member of Radnor's four-member Board of Directors is immaterial. In *SubMicron*, the Third Circuit refused to recharacterize the debt as equity notwithstanding that the debtors' largest secured creditors held half of seats on the debtor's board. *See id.*, 432 F.3d at 457-58 (it is "not unusual for lenders to have designees on a company's board, particularly when the company [is] ... distressed."). The Court therefore holds that Mr. Feliciano's role as one of four members of the board does not weigh in favor of recharacterization.

7.    TCP's receipt of non-public information and *ability* to obtain more board seats is similarly immaterial.  TCP never exercised its rights to obtain additional representation on the Radnor board.  *See* FOF 13.  The mere "right" or "ability" to control, without exercising that control, does not constitute the level control relevant to the issue of recharacterization.  Mr. Feliciano's participation in board meetings, and TCP's receipt of information, were consistent with good faith efforts to provide valuable advice to the Debtors and to conduct due diligence.

8.    The Court rejects the Committee's claim that TCP exercised undue "control" over Radnor due to the EBITDA covenants in ¶44 of the Credit Agreement. There is no evidence in the record to support the Committee's belief that TCP "knew" that Radnor could not and would not attain the EBITDA levels set forth in that agreement.  Furthermore, the evidence does not support the Committee's claim that TCP exercised undue control over Radnor through the warrant matrix calculations based on Radnor attaining certain levels of EBITDA.  The fact that TCP negotiated the acquisition of warrants for Radnor equity should the Company fail to meet certain projected EBITDA levels is unremarkable and did not constitute "control."

### Equitable Subordination

9.    Although the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest," 11 U.S.C. § 510(c)(i), equitable subordination is "drastic" and "unusual" remedy.  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 291 B.R. 314, 327-29; *see also Waslow v. MNC Commercial Corp., (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D. Pa 1993)

(stating that equitable subordination is an "extraordinary" departure from the "usual principles of equality of distribution and preference for secured creditors") (citations omitted).

10.    The Committee failed to meet its burden of proving that (a) TCP engaged in inequitable conduct; (b) the misconduct caused injury to Radnor's creditors or conferred an unfair advantage on TCP; and (c) equitable subordination of the claim is not inconsistent with the Bankruptcy Code. *Citicorp Venture Capital, Ltd. V. Comm. Of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998); *see also SubMicron*, 432 F.3d at 462. Furthermore, the Court holds that TCP did not engage in "egregious conduct" tantamount to "fraud, overreaching or spoliation." *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002); *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

11.    TCP was not an insider for purposes of equitable subordination, as it was not a "person in control of the debtor." 11 U.S.C. § 101(31)(B)(iii).[2] Evidence that TCP monitored the Company's business and attended Board Meetings is insufficient; the Committee failed to prove that TCP exercised "day-to-day control" over Radnor's business affairs and dictated Radnor's business. *See Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 279 (Bankr. D. Del. 2005) ("[t]here must be day-

---

[2] The Court also holds that TCP's role does not support "insider" status under the other provisions of 11. U.S.C. § 101. *See* 11 U.S.C. § 101(31)(B) (defining "insider" as (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; or (vi) a relative of a general partner, director, officer, or person in control of the debtor.); 11 U.S.C. § 101(31)(E) (insider may include an affiliate or an insider of an affiliate of the debtor); 11 U.S.C. § 101(2) ("affiliate" includes and entity that owns, controls, or holds power to vote 20% or more of the debtor's outstanding voting securities). The fact that Mr. Feliciano was a board member does not make TCP an insider. *See Gray v. Chace (In re Boston Publ'g Co., Inc.)*, 209 B.R. 157, 169-70 (Bankr. D. Mass. 1997) (person who was both a shareholder and a creditor of a debtor and who designated a board member was not an insider).

to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.").

12.     TCP's access to performance reports and other financial information from the Company is insufficient to establish insider status. *See, e.g., Meeks v. Bank of Rison (In re Armstrong)*, 231 B.R. 746, 750 (Bankr. E.D. Ark. 1999) ("Even if the bank requires the debtor to submit frequent reports on receivables, invoices, and operations, receives all payments on the receivables, has the power to endorse checks, and obtain concessions from the debtor, the bank is not thereby an insider because there is no control of the day-to-day decision making of the debtor.") (emphasis added); *Gray v. Mankflow (In re Optical Techs., Inc.)*, 252 B.R. 531, 539 (M.D. Fla. 2000), *aff'd*, 246 F.3d 1332 (11th Cir. 2001) (to be determined a person in control, the person must control the company so as to dictate corporate policy and disposition of corporate assets without limits") (emphasis added).     Indeed, National City Bank also received non-public information from Radnor on a regular basis. *See* FOF 24.

13.     TCP did *not* engage in misconduct; TCP did *not* seek to benefit itself at the expense of others; TCP did *not* seek to mislead trade creditors, public noteholders or other stakeholders.    TCP at all times acted in good faith with a view to maximize Radnor's value to all constituents.    The testimony on these issues was consistent and credible.  Furthermore, no member of the Committee appeared at trial to offer testimony inconsistent with the foregoing conclusions.

14.     Principles of equity require a finding that the Loans should not be subordinated. The Loans advanced by TCP enhanced liquidity of the Company and, among other things, allowed the Company to continue operations. Contrary to the central

theme of the Committee's case, the preferred stock transaction and the Tranche A and Tranche B loans resulted in a reduction of the Company's net debt. *See* FOF 22. Further, the unsecured bondholders expressly consented to the Tranche C Loans. *See* FOF 42-43.

15.    Even were TCP's conduct viewed under the more stringent standards applied to insiders, the Court holds that the Committee has failed to prove that TCP engaged in wrongful conduct such as (a) fraud, illegal conduct or a breach of fiduciary duty; (b) undercapitalization; and (c) use of the Debtor as a mere instrumentality or alter ego. *In re Mid-American Waste,* 284 B.R. at 70; *See, e.g., In re Epic Capital,* 290 B.R. at 524; *In re M. Paolella & Sons,* 161 B.R. at 118.

## Breach of Fiduciary Duty Claims

### A. Claims Not Pled or Dropped After Trial.

16.    The Committee tried this case as if it were a "deepening insolvency" case. Presumably, none of the Counts of the Complaint were denominated "deepening insolvency" due to the recent rejection of such a cause of action under Delaware law. *See Trenwick Am. Litig. Trust v. Ernst & Young, LLP,* 906 A.2d 168 (Del. Ch. 2006); *see also Seitz v. Detweiler, Hershey & Assoc. (In re CitX Corp.),* 448 F.3d 672 (3d Cir. 2006) (rejecting deepening insolvency as a theory of damages). However, simply calling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster. As I conclude below, the *Trenwick* opinion made quite clear that under Delaware law, a board is not required to wind down operations simply because a company is insolvent, but rather may conclude to take on additional debt in the hopes of turning operations around. *See* COL 22.

17.    I further conclude that deepening insolvency fares no better as a cause of

action directly against Tennenbaum than it would against Radnor's board. As the Third Circuit discussed in *CitX*, stock investments like TCP's \$25 million preferred stock investment lessen insolvency rather than increasing it. *In re CitX*, 448 F.3d at 677.

18.     Moreover, the *CitX* court noted that the making of a loan similarly does not increase insolvency; it increases liabilities (the amount of the loan) and assets (the cash provided by the loan) in the same amount. *Id.* at 677 (citing Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 552-57 (2005)). I find the Third Circuit's conclusion particularly relevant here: "Any increase in insolvency (*i.e.*, the several million dollars of debt incurred after the . . . investment) was wrought by *CitX*'s management, not by Detweiller." *In re CitX*, 448 F.3d at 677. No matter how the Committee titles its causes of action, the holding of *CitX* defeats the claim.

19.     I also note that the Committee dropped after trial all of its causes of action for the breach of the duty of care. Undoubtedly, it did so because Article Seventh of Radnor's Certificate of Incorporation (JX 350) exculpates Radnor's directors from liability for breach of the duty of care, a permissible provision pursuant to 8 DEL. CODE ANN. § 102(b)(7). Section 102(b)(7) provisions act as a complete bar to liability even when creditors or a trustee, rather than stockholders, are suing derivatively. *Production Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 793 (Del. Ch. 2004); *Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005), *cert. denied*, 2006 U.S. LEXIS 3965.

20.     However, the fact that the Committee has dropped its duty of care claims does not render Article Seventh and § 102(b)(7) meaningless to this case. To the contrary, much of the Committee's case at trial at best would have implicated the duty of care, not the duty of loyalty. By way of example only, if the Radnor board should not

have approved a $55 million EBITDA maintenance covenant because that number was too high (and the Court need not and does not make such a finding here), it did not do so in bad faith; rather, the only potential breach would have been in not understanding that the Company's projections were optimistic and that the maintenance covenant, set at the $55 million level, ran too high of a risk of causing a default. That is a quintessential duty of care claim. Simply alleging that Mr. Kennedy desired funding at any cost does not convert this claim into one implicating the duty of loyalty. Thus, Article Seventh and § 102(b)(7) would have barred any such claims against the board, and Tennenbaum and Mr. Feliciano therefore could not have possibly been held liable for aiding and abetting such claims.

**B.    Aiding and Abetting Claim.**

21.    TCP never aided and abetted a breach of fiduciary duty. The elements for aiding and abetting a breach of fiduciary duty under Delaware law are as follows: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 584 (Del. Ch. 1998). The evidence does not support a finding that any of these elements have been satisfied.

22.    Even if the Debtors were insolvent at the time of the Tranche A, B and C transactions, the Radnor Board's actions would not have breached any fiduciary duties owed to the Debtors' unsecured creditors. As the Court of Chancery acknowledged in *Trenwick*, Delaware law does not impose an absolute obligation on the board of an insolvent company to cease operations and liquidate. *See Trenwick*, 906 A.2d at 204. Rather, directors of an insolvent company may pursue strategies to maximize the value of

the company, including continuing to operate in the hope of turning things around. *See id.*; *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997) (permitting board of company within days of a bankruptcy filing to incur new secured debt in aid of funding risky but promising new products over the objection of preferred stockholders with liquidation preference). Specifically, the Court in *Trenwick* stated as follows:

> If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

*Trenwick*, 906 A.2d at 205 (emphasis supplied). Thus, "the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm." *Id.* at 195 n.75.

23. The Court holds that the Radnor Board did not act disloyally in entering into the transactions with Tennenbaum. *See* FOF 4, 17, 34, 52. Given the company's prospects with its new products, the advice of competent financial advisors and the consideration of the board, I find no basis in the record for the Committee's repeated assertion that Mr. Kennedy was "swinging for the fences" just to protect his equity investment, rather than acting in the best interests of the company and its stakeholders. Indeed, the Court notes that Mr. Darr's concession that had the company liquidated in October 2005, even without considering transaction costs, such liquidation would have ensured a substantial loss for unsecured creditors (Tr. 670-71), provides a good faith basis for the Radnor board to have continued with its business plan rather than shutting

down prematurely.

24.    The Radnor Board's good faith decisions to enter into the subject transactions with Tennenbaum to aid Radnor in carrying out its business plan are afforded the protection of the business judgment rule.    Radnor's business judgment against liquidation and in favor of attempting to continue operations and continue with its business plan of expansion was not inherently wrongful.    *See Official Comm. of Bond Holders of Metricom, Inc. v. Derrickson*, No. C 02-04756 JF, 2004 WL 2151336, at *5 (N.D. Cal. Feb. 25, 2004) (even in the zone of insolvency, it is not a breach of fiduciary duty under Delaware law to carry out the company's business plan).[3]

25.    The Court also rejects the Committee's argument that TCP aided and abetted the board's breach of fiduciary duty of accepting TCP's stalking horse bid.    That argument is precluded by the law of the case, since the Bidding Procedures Order already approved the stalking horse bid as in the best interests of the estates.    FOF 52; *see also E. Pilots Merger Cmte. v. Cont'l Airlines, Inc. (In re Continental Airlines, Inc.)*, 279 F.3d 226, 232 (3d Cir. 2002), *cert. denied*, 537 U.S. 944 (2002) (law of the case doctrine "limits relitigation of an issue once it has been decided.").

26.    Additionally, the Committee has failed to demonstrate "knowing participation" on the part of Tennenbaum in any breach.    Tennenbaum was a participant in the complained-of transactions, but that fact alone does not subject it to liability for aiding and abetting breaches of fiduciary duties.    *See HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 121 (Del. Ch. 1999) (aiding and abetting claim must be supported by

---

[3] In this respect, the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are not named as defendants. The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers were not named as defendants.

proof of an understanding between the parties "with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties"). Rather, a plaintiff must prove that the defendant knowingly participated not just in the transactions but in the breach of fiduciary duties. *See id.*; *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (to satisfy the "knowing participation" element, a plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].") Tennenbaum reasonably relied on the Debtors' officers' representation that the Debtors were solvent at the time that the transactions at issue were entered into. *See* FOF 15, 32, 33. Given this representation, Tennenbaum would have had no reason to know that fiduciary duties were even owed to creditors, much less that they were breached.

## C. Claims Against Mr. Feliciano For Breach of Duty of Loyalty.

27. The Court holds that Mr. Feliciano did not breach his duty of loyalty. The Committee has failed to prove that Mr. Feliciano was interested in any transaction and voted in favor of it due to his outside financial interests rather than voting in the best interests of Radnor. *Cede & Co. v. Technicolor Inc.*, 634 A.2d 345, 363 (Del. 1993) ("to establish a breach of duty of loyalty, [plaintiff] must present evidence that the director either was on both sides of the transaction or 'derive[d] any personal financial benefit from it in the sense of *self-dealing*, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'") (emphasis in original).

28. Indeed, the Committee only complains of two transactions that occurred after Mr. Feliciano became a director. In connection with the first, the Tranche C Loan, the record evidence is that Mr. Feliciano *abstained* from the vote. *See* FOF 35, 47. The

second is the stalking horse bid. The record reflects that Mr. Feliciano resigned from the board in June 2006, *see* FOF 51, and that Radnor first approached Tennenbaum about making a stalking horse bid in July. (Tr. 1476). Simply put, Mr. Feliciano did not vote on either transaction, much less vote in his self interest. Nor does the record support that Mr. Feliciano used his board seat to pressure the other directors into the Tranche C and stalking horse deals. *See* FOF 51.

29.    To the extent the Committee relies on Tennenbaum's prior relationship with Lehman Brothers, or Mr. Feliciano's failure to disclose the prior relationship to the board, as support for this claim, the Court concludes that the prior relationship did not present an actual conflict. Nor is there evidence to support that the prior relationship had any influence on Lehman's conduct, provided an advantage to Tennenbaum, or resulted in any damage to any constituency. Both Mr. Feliciano's and Lehman's Mr. Shapiro's testimony about this issue – in particular the extent and tenuous nature of the prior relationship – is consistent with the Court's conclusion.

30.    I likewise find no merit in the separate allegation that Mr. Feliciano breached his duties by using his knowledge to bid on the assets of Radnor in this bankruptcy case. As a matter of law, there is no *per se* breach of fiduciary duty for an insider making a bid to purchase a company or its assets. Were it otherwise, every management led leveraged buyout would be a *per se* breach of fiduciary duty, yet the Delaware courts have held otherwise. *See, e.g., In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003); *Lewis v. Leaseway Trans. Co.*, Civ. Act. No. 8720, 1990 Del. Ch. LEXIS 69 (Del. Ch. May 16, 1990). Moreover, as noted above, it is the law of the case that it was in the Debtors' interest to enter into the stalking horse bid. COL 25.

Therefore, there can be no breach of duty by Mr. Feliciano in using information about Radnor in formulating that bid, since that bid helped Radnor.

### Disallowance of Proof of Claim

31.     The proof of claim filed by Tennenbaum established the *prima facie* validity of the Tennenbaum claim in the amount of $128,835,557.26 as of the petition date, plus post petition accruals and expenses referred to therein. *See* Fed. R. Bankruptcy Procedure 3001(f) ("a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim"). *See also In re International Wireless Communs. Holdings, Inc.*, 257 B.R. 739 (Bankr. D. Del. 2001) ("Initially, a claimant must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Bankruptcy Rule 3001(f)."). Thus, Tennebaum has met its burden of proof, and its proof of claim is allowed until an objection supported by substantial evidence is presented to the Court. *See In re Mid-American Waste*, 284 B.R. at 65 (party objecting to properly filed proof of claim bears the initial burden of presenting sufficient *evidence* to overcome the presumed validity and amount of claim); *Brown v. IRS (In re Brown), 82 F.3d 801 (8th Cir. 1996)* (a claim's presumptive validity is not altered unless an objection is supported by *substantial evidence*). The Committee has offered the Court no evidence, let alone substantial evidence, contesting any component of Tennenbaum's claims. Accordingly, Tennenbaum's proof of claim is allowed, as of the Petition Date, in the amount of $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

32.    The Court's Bid Procedures Order (Dkt. 144) provided that Tennenbaum would be allowed to credit bid its allowed claim to the full extent allowed by Bankruptcy Code Section 363(k). Accordingly, Tennenbaum is authorized to credit bid the full amount of its claim, in an amount equal to $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

## Avoidance of Liens

33.    The proof of claim filed by Tennenbaum in the amount of $128,835,557.26 as of the petition date included copies of properly recorded mortgages, fixture filings and UCC financing statements. *See* FOF 55. The Committee submitted no evidence contradicting the validity or enforceability of the liens and security interests securing such claim. Once a secured creditor shows its properly filed financing statements, it has established a *prima facie* secured claim; and a secured creditor is not required to show that its security interests are not voidable in order to establish its secured status. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992).

34.    Thus, I hold that Tennenbaum met its initial burden of proof with respect to its liens and security interests, and because the Committee submitted no substantial evidence contradicting such liens and security interests, Tennenbaum need present no further proof of the validity and enforceability of its liens and security interests.

## Preference Claim

35.    Under Bankruptcy Code Section 547(b)(5), the burden of proof is on the Committee to show that Tennenbaum was under-secured. *Batlan v. Transamerica*

*Commer. Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 963-64 (9th Cir. 2001) (stating that transfers to fully-secured creditors are generally not preferential because fully-secured creditors are entitled to recover 100 percent of their claims in a liquidation); *Lease-A-Fleet v. Wolk (In re Lease-a-Fleet, Inc.)*, 151 B.R. 341, 348 (Bankr. E.D. Pa. 1993) (plaintiff in a preference action must prove defendant is unsecured or undersecured); *O'Neill v. Dell (In re O'Neill)*, 204 B.R. 881, 892 (Bankr. E.D. Pa. 1997) (same). Section 547(b)(5) is not a defense to a preference; rather it is a fundamental component of the case-in-chief of a preference claim, and, under Section 547(g), the burden of proof on every element of Section 547(b) is on the Committee. *Mellon Bank, N.A.*, 945 F.2d at 642; *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 107 (Bankr. D. Del. 2006) (trustee must establish each element of section 547(b), including section 547(b)(5)); *IT Litigation Trust v. Alpha Analytical Labs (In re IT Group, Inc.)*, 331 B.R. 597, 601 (Bankr. D. Del. 2005) (creditor's committee, as plaintiff, had burden of proving each of the elements under 547(b)).

36.    The Committee offered no evidence at all on the issue of the value of the collateral securing Tennenbaum's claim. The Court finds that the only competent evidence admitted at trial shows that the collateral securing the Tennenbaum claim was valued at more than $132 million: millions of dollars more than Tennenbaum's $128.8 million petition date claim. FOF 56. Therefore, the Committee has failed to meet its burden of proof.

37.    Additionally, the Court concludes that the interest payment at issue was made on April 4, 2006, outside the 90-day preference period. Therefore, the payment is a preference only if Tennenbaum was not insider for the purpose of the one-year

39

reachback period of Section 547(b)(4)(B). However, I already have concluded that Tennenbaum was not an insider. *See* COL 11.

38.    Whatever influence Tennenbaum exerted on the direction of the Debtors was indirect, arising from the covenants and other provisions Tennenbaum contracted for in the Credit Agreement, which is not sufficient to turn a secured lender into an insider of the Debtors. Reasonable financial controls negotiated at arms' length between a lender and a borrower does not transform a lender into an insider. *See In re Winstar Commc'n., Inc.,* 348 B.R. at 279 (there must be *day-to-day control,* rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake); *In re Octagon Roofing,* 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991) (exercise of financial control by a creditor over a debtor which is incident to the creditor-debtor relationship, does not make the creditor an insider); *In re Huizar,* 71 B.R. 826, 832 (Bankr. W.D. Tex. 1987) (creditor-lending institutions must be able to exercise a reasonable amount of debtor control without fear of being labeled an insider). Similarly, the mere opportunity to exercise control, if not exercised, also does not make a creditor a person in control of a debtor. *In re Wescorp, Inc.,* 148 B.R. 161 (Bankr. D. Conn. 1992); *In re Tech. for Energy Corp.,* 56 B.R. 307, 316 (Bankr. E.D. Tenn. 1985) (defendant held not to be an insider where it attained control of Debtors' voting stock but did not exercise such power); *In re Piece Goods Shop, Co., L.P.,* 188 B.R. 778 (Bankr. M.D.N.C. 1995) (because right to elect directors was never exercised, defendant held not to be an insider).

39.    The Court also finds that the interest payment cannot be avoided for an additional reason: it was made in connection with a contemporaneous exchange with Tennenbaum, in which Tennenbaum provided more than $20 million of net new value to

the Debtors, and the parties clearly intended such interest payment and new value to be a contemporaneous exchange. *See* FOF 59. Under Bankruptcy Code Section 547(c)(1), a transfer is not a preference if it was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."

40.     A creditor provides new value when it makes a loan to the debtor. *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir. 1994). Tennenbaum's delivery of more than net $20 million to the Debtors on April 4, 2006 as an additional advance under the Credit Agreement is new value for the purposes of Section 547(c)(1). Even if some of the new value is used by a debtor to pay pre-existing debt, the transfer falls within the four corners of 11 U.S.C. § 547(c)(1) if the amount transferred to the debtor exceeds the amount repaid on pre-existing debt. *In re Arrow Air, Inc.*, 940 F.2d 1463, 1466 (11th Cir. 1991); *In re Erin Food Servs., Inc.*, 117 B.R. 21, 30-31 (Bankr. D. Mass. 1990).

### Acquiescence

41.     The Committee's equitable subordination and breach of fiduciary duty Counts are causes of action sounding in equity. In addition to holding that the Committee has failed to prove its case-in-chief on these Counts, I conclude that the Committee's claims are barred by the equitable defense of acquiescence, as applied by the Delaware courts.

42.     It has long been the law of Delaware that where a transaction cannot be accomplished without stockholder approval, a stockholder who either votes in favor of the transaction or accepts the consideration offered by the transaction is barred from

asserting claims in claims in connection with that transaction. *See, e.g., Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 176-77 (Del. 1991); *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 848 (Del. 1987); *Elster v. Am. Airlines*, 100 A.2d 219, 220-221 (Del. Ch. 1953); *Finch v. Warrior Cement Corp.*, 141 A. 54, 60 (Del. Ch. 1928). Here, 95% of the noteholders, including *a majority of the members of the Committee*, did both: they voted in favor of Tranche C and accepted $675,000 in exchange for their consent. Thus, they have acquiesced to the Tranche C Loans. Having acquiesced to it, they cannot now be heard to argue that Tranche C should be treated as equity, nor that entering into Tranche C was a breach of fiduciary duty.

43.     While the Committee is a separate legal entity from the notcholders who approved Tranche C, the Delaware cases draw no such distinction. They typically arise in a class action context, where like the seven members of the Committee, a stockholder attempts to bring claims not only on his or her own behalf, but on behalf of <u>all</u> stockholders, including stockholders that did not acquiesce. Nevertheless, the Delaware courts have barred the stockholders who acquiesced from asserting such claims on behalf of those who did not. *See, e.g., Kahn,* 591 A.2d at 176-77; *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 738 (Del. Ch. 1999), *aff'd sub. nom.*, Walker v. Lukens, Inc., 757 A.2d 1278 (Del. 2000) (TABLE) (noting, because a "large majority of the putative plaintiff class...both voted in favor of the merger and received the benefits of it," that "plaintiffs would confront substantial obstacles in continuing the action on behalf of those persons"). I find that the noteholders who control the Committee are in the same position and cannot maintain their equitable subordination and breach of fiduciary duty claims.

42

### Damages

44.     Even if I were to hold that the Committee had prevailed on one or more of its claims for breach of fiduciary duty, I would hold that it has failed to prove a recognizable measure and amount of damages. First, while Mr. Darr denied it, his damages calculation essentially is a deepening insolvency model, as it calculates the difference between the value that the unsecured creditors would have received if the Debtors filed for bankruptcy in October 2005 and the value available to them in this bankruptcy case.[4]     (Tr. 692-93).     The Third Circuit recently held that deepening insolvency is not a recognized form of damages. *In re CitX Corp.*, 448 F.3d at 677-78; *cf.* COL 16-18. Because I find Mr. Darr's methodology to be indistinguishable from deepening insolvency and I find deepening insolvency to be an impermissible measure of damages, I find no basis in the record from which to compute damages.

45.     Moreover, Mr. Darr's damages calculation is overstated. First, more than half of his computed damages assume that the Committee *loses* its subordination and recharacterization arguments. (Tr. 694-96). Second, he readily conceded that he did not subtract transaction costs from his analysis, but it is indisputable that to realize any value at October 27, 2005, Radnor would have had to file for bankruptcy or undertake an extraordinary corporate transaction, both of which are expensive. (Tr. 706-08). Third, Mr. Darr's damages model incorrectly assumes that Radnor's value as of October 27, 2005 would not have been further reduced by Radnor's poor operating performance even

---

[4] Mr. Darr's attempts to distinguish his model from deepening insolvency were unavailing. The fact that his model does *not* assume that the Defendants committed any wrong, Tr. 692-94, makes me less likely to apply the damages formulation, as that is a concession that there is no causation between the harm and the damages alleged. *See, e.g., Gannett Co., Inc. v. Kanaga, M.D.,* 750 A.2d 1174, 1188 (Del. 2000) ("Once liability is established, a plaintiff seeking recovery of damages in a tort action must establish causation and consequential damage."). Mr. Darr's other attempt to distinguish deepening insolvency, on the ground that he does not include new *unsecured* debt, Tr. 692-93, simply is irrelevant, since he is showing deterioration in value *above* the unsecured creditor level.

if it had been restructured in a bankruptcy on that date, an illogical assumption given the Company's financial performance after October 27.

46.     Finally, I note that Mr. Darr opined that he had no opinion as to who caused the damages or any  inequitable conduct engaged in connection therewith (Tr. 694:4-9) and the theories offered by the Committee are rejected as discussed above.


Dated: Nov. 17, 2006
Wilmington, Delaware

**HONORABLE PETER J. WALSH,
UNITED STATES BANKRUPTCY JUDGE**